UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:17-CV-22652-KMW

DAVID M. RODRIGUEZ, individually and on
behalf of all others similarly situated,

        Plaintiff,

v.

THE PROCTER & GAMBLE COMPANY,

        Defendant.

**THE PROCTER & GAMBLE COMPANY'S
MOTION FOR FINAL SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

A.  Introduction .................................................................................................... 1

B.  Factual background ......................................................................................... 2

    P&G's internship program ............................................................................. 2

    Recruiting and hiring process ...................................................................... 3

    Rodriguez's application .............................................................................. 4

    Immigration questions in the application.................................................... 5

    DACA Program .......................................................................................... 5

C.  Summary judgment standard ......................................................................... 6

D.  Argument ....................................................................................................... 7

    1. Plaintiff does not belong to a class protected under Section 1981 ................ 7

    2. P&G's policy classifies based on immigration status, not on citizenship ................... 10

    3. P&G's policy is not per se discriminatory based on an equal-protection analysis....... 13

    4. *Juarez* was wrongly decided.................................................................. 15

    5. It is undisputed that Rodriguez would have been rejected for another reason ............ 17

Defendant The Procter & Gamble Company ("P&G"), pursuant to Fed. R. Civ. P. 56, moves for final summary judgment on Plaintiff David Rodriguez's 42 U.S.C. §1981 claim because there is no genuine dispute as to any material fact and P&G is entitled to final judgment as a matter of law.

A.  Introduction

David Rodriguez, a Deferred Action for Childhood Arrivals ("DACA") recipient whose application for an internship position was rejected by P&G, sues for citizenship discrimination under 42 U.S.C. §1981.  His claim fails for four reasons.

First, Section 1981 does not protect from citizenship discrimination aliens who are not lawfully admitted to the U.S.  *See Takahashi v. Fish and Bone Commission*, 334 U.S. 410, 419-20 (1948).  It is undisputed that Rodriguez, as a DACA recipient, is "unlawfully present" in the U.S. and is subject to deportation.  *See Estrada v. Becker*, 917 F.3d 1298, 1305 (11th Cir. 2019). Rodriguez therefore cannot sustain a Section 1981 claim.

Second, even if Section 1981 protected DACA recipients, P&G rejected Rodriguez's application based on his DACA status, not his citizenship.  As many courts have held, immigration status and citizenship status are different categories.  In fact, the Eleventh Circuit made clear that DACA recipients are "not similarly situated" to permanent residents, refugees, or asylees—the categories of non-citizens who were accepted under the P&G policy Rodriguez assails.  *Id*. at 1311. Unlike the categories of non-citizens that P&G routinely hires, DACA recipients are not lawfully in the country, can be deported at any time, and have only a short-term work authorization.  *Id*. at 1305. As the Eleventh Circuit explained, these factors render DACA status different from the many other non-citizens that P&G routinely hires.  *See id*. at 1311.

Third, the Eleventh Circuit's refusal to classify DACA recipients as a "suspect class" under the Equal Protection Clause further establishes that a policy that classifies based on DACA status is not facially-discriminatory.  *See id*. at 1308-09.  Even *Juarez v. Nw. Mutual Life Ins. Co., Inc.*, the

decision that Rodriguez primarily relies on, acknowledges that the analysis of equal-protection claims is critical to defining a protected class under Section 1981. *See* 69 F. Supp. 3d 364, 372 (S.D.N.Y. 2014). The conclusion reached in *Juarez*, however, was wrong. Its holding was based on a faulty analysis of immigration and citizenship considerations, and the Eleventh Circuit has since contradicted the *Juarez* court's equal-protection analysis. *See Estrada*, 917 F.3d at 1308-09.

Finally, P&G is entitled to summary judgment because, even if its policy or practice were "facially-discriminatory," it is undisputed that it would have rejected Rodriguez's application for non-discriminatory reasons, a defense that constitutes a complete bar to liability under Section 1981.

For these reasons, which P&G explains and supports below, Rodriguez's claim fails as a matter of law, and P&G is entitled to final summary judgment.

## B. Factual background

### P&G's internship program

P&G manufactures and distributes a wide array of consumer products. It is organized into various segments, including health care, grooming, and home care products. Isenhart Dec. ¶ 3.[1] It employs over 90,000 employees worldwide, including over 20,000 in the United States. *Id.*

As P&G advertises widely, it is a "develop from within" company—one that seeks to identify talent, provide new hires with developmental opportunities, and create the best atmosphere for successful long-term careers. *Id.* ¶ 5. As part of its talent identification and development efforts, P&G maintains an annual internship program. *Id.* ¶ 6. It receives over 40,000 applications for internship positions each year. *Id.* After a highly-competitive process that requires

---

[1] P&G is filing the declaration of Scott Isenhart, North America Talent Supply Leader, as Exhibit 1 to the Notice of Filing Exhibits (D.E. 104.) It also is filing the transcript of the deposition of Rodriguez and excerpts of the deposition of Isenhart as Exhibits 2 and 3 respectively to the same Notice. In this Motion, P&G will cite to both Isenhart's declaration and his deposition transcript, and to the transcript of Rodriguez's deposition.

successfully completing several interviews, P&G hires a few hundred interns. *Id.* They are assigned to the various functions, including finance and accounting, legal, and sales. *Id.* P&G spends millions of dollars each year recruiting, hiring, and training these interns. *Id.* It makes this investment because it wants to identify talented students who can fit into the company's culture and have a long-term career at P&G. *Id.* Indeed, the goal of the internship program is not to hire interns to meet short-term personnel needs. *Id.* Rather, P&G invests in individual interns in the hope that they will have long-term careers with the company. *Id.*

<u>Recruiting and hiring process</u>

P&G recruits at dozens of colleges and universities, including universities known to have large immigrant populations. *Id.* ¶ 7. It employs on-campus recruiters, who promote internship and entry-level job opportunities and encourage interested students to apply. *Id.*

All candidates must first complete an online application, which asks several background questions. *Id*. ¶ 8. Candidates also typically upload copies of their resumes. *Id.* An applicant may be rejected automatically based on answers to specific questions in the online application. *Id.* Depending on the position, these questions include the number of courses taken in a specific field, the applicant's expected graduation date, and the applicant's prior relevant work experience. *Id.* They also include questions about an applicant's immigration status. *Id.*

All applicants who are not rejected automatically must take two internal assessment tests. *Id.* ¶ 13. After completing these first steps, a group of decision makers select several applicants for initial interviews. *Id*. These interviews are often conducted telephonically. *Id.* After these initial interviews, a select number of candidates are chosen for a second interview. *Id.* These candidates are usually flown to a corporate office for in-person interviews. *Id.* After this process, only a few applicants are offered internships. *Id.* In fact, less than 1% of more than 40,000 applicants are chosen for internships. *Id.*

Rodriguez applied in 2013 for an accounting and finance internship for the summer of 2014. Pl. depo. at 71:7-9; 73:20-74:8. Over 4,000 candidates typically apply for this same internship position. Isenhart Dec. ¶ 14. About twenty-five were hired. *Id.* Scott Isenhart, North American Talent Supply Leader, was one of the decision-makers for this internship. *Id.* ¶ 13. As he explains, the selection process was very competitive. *Id.* Given the large number of applicants, the decision-makers emphasized prior experience. *Id.* P&G sought applicants with prior internships in similar areas, work experience in finance or accounting, or a history of having exercised leadership skills. *Id.* As Rodriguez admitted, he had never held an internship position, had no prior experience in finance or accounting, and had not held any leadership positions in any school or civic organization. Pl. depo. at 71:16-73:19; resume attached as Exh. 4 to Pl. depo.

<u>Rodriguez's application</u>

Rodriguez was a student at Florida International University ("FIU") in 2013. Pl. depo. at 45:16-23. P&G recruited at FIU, a school the company knew had a large Hispanic and immigrant population. Isenhart Dec. ¶ 7. In fact, P&G sent a recruiter (an FIU graduate who worked at P&G) to recruit at the school. Pl. depo. at 110:23-24; 118:4-17. Rodriguez attended a meeting with the recruiter and the "campus ambassador," another FIU student who worked at P&G. Pl. depo. at 110:21-111:13; 141:4-5; 218:4-20. They encouraged Rodriguez to apply, and he did. *Id.*

Rodriguez's online application, however, was rejected based on his answer to a question that asked whether he was a U.S. citizen, a permanent resident, refugee, or asylee. *Id.* at 194:3-24. Rodriguez thus did not have any long-term lawful status in the U.S. Instead, he was part of the DACA program, and at the time had been given a temporary work authorization that expired in less than two years. *Id.* at 29:23-25; 30:25-31:6. Therefore, he could not answer "yes" to the question that asked whether he was a citizen or an alien with permanent authorization to live in the U.S. As an email he received at the time explained, "applicants in the U.S. should be legally

-4-

authorized to work with no restraints on the type, duration, or location of employment." *Id.* at 151:20-22.

Immigration questions in the application

In 2013, P&G's online application asked all internship applicants:

> Are you currently a U.S. citizen OR national, OR an alien lawfully admitted for permanent residence, OR a refugee, OR an individual granted asylum, OR admitted for residence as an applicant under the 1986 immigration amnesty law?  Please answer this question based on your current status only.  Do not answer based on a status for which you have applied, but have not been granted.

Exh. 7 to Pl. depo. at p. 5.  P&G wants to develop talent internally.  Isenhart Dec. ¶ 5.  It seeks applicants who can make a long-term commitment to the company.  *Id.*  For that reason, it asked applicants whether they fell into one of the many immigration categories for lawfully admitted aliens.  Permanent residents, refugees, or asylees—all of whom are aliens (noncitizens)—were not rejected based on their immigration status.  *Id.*  In fact, P&G routinely hires non-citizens who have a permanent authorized immigration status.  *Id.* ¶ 16.  Indeed, the categories that were listed in P&G's 2013 application were those authorized under the Immigration Reform and Control Act of 1986, which lists several categories protected from "citizenship discrimination."[2]  Rodriguez did not fall into any of these categories.  Instead, he was a DACA recipient who, as the Eleventh Circuit made clear less than two months ago, was not lawfully-admitted to the U.S. and was subject to deportation.  *See, e.g., Estrada*, 917 F.3d at 1305, 1311.

DACA Program

The DACA program was established in 2012.  As the Eleventh Circuit summarized:

> Back in 2012, the Secretary of the Department of Homeland Security… issued the DACA Memo, which encouraged government

---

[2] Over the years P&G has revised the immigration-related questions it asks in its online application.  For example, the last two years it asks only whether an applicant needs or will need visa sponsorship.  Isenhart Dec. ¶ 9.

> officials not to enforce federal immigration laws against certain
> children who came to the United States before age 16.  Instead,
> officials were encouraged to exercise their prosecutorial discretion
> and to focus on higher-priority cases.

*Estrada*, 917 F.3d at 1301.  The Eleventh Circuit explained, however, that "[t]he DACA Memo explicitly pointed out that it 'confer[red] no substantive right, immigration status or pathway to citizenship.'"  *Id.*  The Court thus emphasized that DACA recipients are not "lawfully admitted" to the United States, are "not legally present," and remain subject to deportation.  *Id.* at 1305, 1311.[3]

Rodriguez, a DACA recipient, admits that he had no permanent legal status in the United States.  He was not (and is still not) a permanent resident, refugee, or asylee.  Pl. depo. at 137:23-138:19.  He nonetheless claims that P&G's rejection of his application constituted discrimination under Section 1981.  But as P&G explains below, it is undisputed that P&G did not reject him based on his citizenship; it rejected him because he did not have a permanent, lawfully admitted immigration status, a reason that is not proscribed by Section 1981.  For this and the other reasons explained below, his claim fails as a matter of law.

C. Summary judgment standard

Summary judgment is appropriate when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  The function of the trial court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986).  "The moving party bears the initial burden to show the district court . . . that there [is] no genuine issue[] of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991).  "Only when that burden has been met

---

[3] As the DACA Memo also explained, only "Congress, acting through its legislative authority, c[ould] confer these [permanent] rights."  *Estrada*, 917 F.3d at 1301 (brackets in original).

does the burden shift to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* Allegations, argument, or conclusions are not enough to forestall summary judgment. *See Anderson,* 477 U.S. at 252, 256. As P&G shows below, there is no issue of material fact that precludes the entry of judgment as a matter of law on Rodriguez's Section 1981 claim.

## D. Argument

### 1. Plaintiff does not belong to a class protected under Section 1981

Section 1981 does not protect aliens who are not lawfully present in the United States. *See Takahashi v. Fish and Bone Commission*, 334 U.S. 410, 419-20 (1948). Only aliens who are lawfully present in the country under the immigration laws adopted by Congress are covered by the anti-discrimination protections enacted under the Fourteenth Amendment, including Section 1981. *See id*.; *Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) (concluding that employers that refuse to hire undocumented aliens are not liable for alienage discrimination under Section 1981). The Eleventh Circuit has now made clear that recipients of DACA status are not lawfully present aliens. *See Estrada*, 917 F.3d at 1305 (explaining that DACA recipients are not lawfully present in the United States). Rodriguez, an alien who is a DACA recipient, thus is not lawfully present in the United States and is not protected from citizenship discrimination under Section 1981.

In *Takahashi*, the Supreme Court explained that "Congress, in the enactment of a comprehensive legislative plan for the nation-wide control and regulation of immigration and naturalization," provided the protections codified in Section 1981. 334 U.S. at 419. As the Court noted, "[t]he protection of this section has been held to extend to aliens as well as to citizens." *Id*. After explaining that Section 1981 had been adopted under the authority of the Fourteenth Amendment, however, the Court made clear that the protection of this law did not extend to aliens

not lawfully present in the country: "The Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that *all persons lawfully in the country* shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." *Id*. at 420 (emphasis added and internal quotations in original).

In *Anderson*, the Second Circuit expanded the protection of Section 1981 to private alienage discrimination. *See Anderson*, 156 F.3d at 160 ("We hold that Section 1981 . . . proscribes private alienage discrimination with respect to the rights set forth in the statute.").  The court emphasized, however, that Section 1981 does not protect aliens who are not lawfully admitted:

> [A]ccording to appellees, applying Section 1981 to claims of private alienage discrimination would lead to the absurd result of holding liable under Section 1981 employers who refuse to hire undocumented aliens in order to comply with IRCA Section 1234a . . . . We disagree.  If an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage but of noncompliance with federal law.

*Id*. at 180 (internal citation omitted).  Even *Juarez*, the case that Rodriguez primarily relies on, stated that its holding was based on the premise that "§ 1981's protection against discrimination extends to all *lawfully present aliens* . . . ."  69 F. Supp. 3d at 368-69 (emphasis added and footnote omitted).[4]  Indeed, no court has held that aliens who are not lawfully present in the United States can sustain an employment-discrimination based on alienage under Section 1981.

Rodriguez is a DACA recipient.  Pl. depo at 29:23-25, 30:25-31:6.  That was his status when he applied for an internship at P&G.  *Id*.  As the Eleventh Circuit made clear just months ago, DACA recipients "are inadmissible and subject to removal proceedings."  *Estrada*, 917 F.3d at 1305. In *Estrada*, a group of DACA recipients challenged a policy by the Georgia Board of Regents that

---

[4] Because *Juarez* assumed that DACA recipients are legal (documented) aliens, it stated that it "need not address the extent, if any, to which §1981's protection against discrimination extends to illegal or undocumented aliens."  69 F. Supp. 3d at 369 n.7.  The Eleventh Circuit has now held that this assumption is wrong. *See Estrada*, 917 F.3d at 1305, 1310.

prohibited any selective public university in Georgia from accepting DACA recipients. *Id*. at 1302-03. In rejecting various challenges to the policy, including a challenge under the Equal Protection Clause, the Eleventh Circuit explained that "[a]s DACA recipients, [plaintiffs] simply were given a reprieve from potential removal; that does not mean that they are in any way 'lawfully present' under the Act." *Id*. at 1305. In fact, the court rejected the plaintiffs' equal-protection claim, holding that heightened scrutiny did not apply because of the DACA recipients' "illegal presence," and because DACA recipients "are inadmissible and thus removable." *Id*. at 1310.[5]

That DACA recipients may have a work authorization does not mean they are lawfully present. As the Eleventh Circuit previously explained, "[d]eferred action status . . . amounts to, in practical application, a reprieve for deportable aliens." *Ga. Latino All. For Human Rights v. Governor of Ga.*, 691 F. 3d 1250, 1250 n.2 (11th Cir. 2012). It does not provide any legal status, much less any permanent status. *See Estrada*, 917 F.3d at 1305.[6]

Rodriguez has no lawful status under the immigration laws. He is not a permanent resident, refugee, or asylee. Pl. depo. at 137:12-139:10. It thus is undisputed that he has never been lawfully admitted to the United States. As a result, he is not covered under Section 1981's anti-discrimination

---

[5] In fact, it is precisely the temporary and uncertain nature of the DACA program that led P&G in 2017 to state that: "We ask the administration and Congress to work together to find a legislative solution to provide employers certainty and allow the U.S. to continue to benefit from the contributions of the 800,000 Dreamers." Isenhart Dec. ¶ 17.

[6] A temporary work permit (an Employment Authorization Document) means that the employer cannot be penalized for hiring the individual. 8 C.F.R. 274a.2 (outlining employer requirements to verify employees are authorized to work). Work authorizations provided to DACA recipients do not confer legal status or provide documentation that the holder is legally authorized to be in the United States. *See Batalla Vidal v. Nielson*, 279 F. Supp. 3d 401, 423 (E.D.N.Y. 2018) (explaining, "DACA, on the other hand, offers only forbearance from deportation, along with work authorization, and does not provide an immigration status or a pathway to citizenship" (citing 2012 DACA Memo at 4)).

protection, and his claim fails.

### 2. P&G's policy classifies based on immigration status, not on citizenship

Rodriguez claims that P&G's policy was facially-discriminatory because it allegedly classified applicants based on citizenship, a category protected under Section 1981. A facially-discriminatory policy is one that classifies based on a protected category. *See Armstrong v. Flowers Hosp., Inc.*, 33 F.3d 1308, 1313 (11th Cir. 1994) ("Facial discrimination occurs when an employer adopts a policy that explicitly treats some employees differently from others on the basis of race, religion, national origin, or gender (pregnancy)."). Rodriguez's argument that P&G's policy is facially-discriminatory is wrong because P&G classified applicants based on immigration status—specifically, their deferred-action status—not citizenship. As many courts have held, immigration and citizenship status are different concepts. Indeed, the Eleventh Circuit has now held that DACA recipients are in a different category than other types of lawfully admitted aliens. *See Estrada*, 917 F.3d 1311. And unlike citizenship, DACA status is not a protected category. For this reason, P&G's policy does not classify applicants based on a protected category, and is thus not facially-discriminatory.

Courts have consistently emphasized the difference between citizenship and immigration status, explaining that they are two distinct characteristics. *See Talwar v. Staten Island Univ. Hosp.*, 2014 WL 5784626 (E.D.N.Y. Mar. 31, 2014), *aff'd in part, vacated in part and remanded on different grounds*, 610 F. App'x 28 (2d Cir. 2015); *Vaughn v. City of New York*, 2010 WL 2076926 (E.D.N.Y. May 24, 2010); *Camara v. Schwan's Food Manufacturing, Inc.*, 2005 WL 1950142 (E.D. Ky. Aug. 15, 2005). As the court in *Vaughn* emphasized, "[i]t is critical to note that alienage discrimination is discrimination on the basis of citizenship discrimination, not

immigration status."  2010 WL 2076926, at *10.[7]

In *Talwar*, for example, plaintiff alleged that her hospital employer terminated her employment because she was a non-citizen.  The notice of termination "referred to her lack of 'permanent licensure.'"  *Talwar*, 2014 WL 5784626, at *7.  Plaintiff alleged that since she could not obtain a permanent license unless she became a U.S. citizen or a permanent resident, the hospital's termination was based on her alienage status and violated Section 1981.  The court disagreed, noting that she could obtain permanent licensure by becoming a permanent resident. *Id*.  Hence, her failure to obtain the license was based on her immigration status, not her non-citizenship.  *Id*.  In rejecting her claim, the court emphasized that citizenship discrimination is different from discrimination based on immigration status.  *Id*.

P&G's policy here classified applicants based on immigration status, not on whether a candidate was a U.S. citizen.  When Rodriguez applied, P&G asked applicants if they were U.S. citizens or fell within several immigration categories, including permanent aliens, refugees, or asylees.  Pl. depo. at 137:12-19.  If they fell within these categories, they were allowed to continue the application process without regard to their citizenship or immigration status.  Isenhart depo. at 220:19-222:22.  Only applicants who did not fall into any of these categories—mostly those who needed visa sponsorship or who had not been lawfully admitted, such as DACA or Temporary Protected Status (TPS) recipients—were rejected automatically.[8]

---

[7] In its Order on P&G's Motion to Dismiss, the Court found that "[t]he cases cited by [P&G] do properly establish that 'alienage discrimination is discrimination on the basis of citizenship, not immigrant status.'"  D.E. 49 at 6 n.2.  At the time, however, the Court emphasized the procedural stage of the cases, noting that two of the main cases were decided at the summary judgment stage, not on motions to dismiss.  *Id*.

[8] The policy has since changed.  For the last two years, P&G only asks whether an applicant needs or will need visa sponsorship.  Isenhart Dec. ¶9.  The law permits employers to reject applicants who need or will need visa sponsorship.  *See* Sept. 27, 2010 Letter from Department of Justice, Civil Rights Division, attached as Exhibit 4 to Notice of Filing Exhibits (D.E. 104).

Thus, P&G's rejection of Rodriguez's application was not based on his citizenship status. Like the plaintiff in *Talwar*, Rodriguez would not have been rejected if he was permanent resident, refugee, or asylee. There is no evidence that Rodriguez was rejected because he is a citizen of Venezuela. Indeed, it is undisputed that, like the plaintiff in *Talwar*, if he were a lawfully admitted alien with permanent work authorization, his application would not have been automatically rejected. His rejection therefore was based not on citizenship but instead on his immigration status. And as courts have consistently held, citizenship and immigration status are not synonymous. *See Talwar*, 2014 WL 5784626, at *7; *Vaughn*, 2010 WL 2076926, at *10 ("It is critical to note that alienage discrimination is discrimination on the basis of citizenship status, not immigration status."); *Ayiloge v. City of New York*, 2002 WL 1424589, at *16 (S.D.N.Y. June 28, 2002) ("Alienage discrimination involves discriminating against an individual on the basis of their foreign citizenship.").

Consistent with this analysis, the Eleventh Circuit recently concluded that DACA recipients are in a different category than even other non-citizens:

> Appellants allege that the Policy allows similarly situated individuals—refugees, parolees, and asylees—to enroll in the selective schools. *But refugees, parolees, and asylees are not similarly situated to DACA recipients.*

*Estrada*, 917 F.3d at 1311 (emphasis added). Essentially, lawfully present aliens share significant attributes that render them part of a different classification from DACA recipients, who are not lawfully-present and remain subject to deportation. *Id*. Because these attributes render DACA recipients "not similarly situated" to lawfully admitted aliens, employers may lawfully classify them differently under Section 1981.

It is undisputed that P&G allows refugees, parolees, and asylees—all of whom are non-citizens—to apply for all open positions. Isenhart Dec. at ¶ 19. They are routinely hired for

internship, entry-level, and management positions. *Id*. Section 1981, however, does not require P&G to invest thousands of dollars in the training, development, and mentorship of interns and entry-level employees who, unlike permanent residents, are subject to immediate deportation.

It is undisputed that P&G routinely hires aliens, recruits at schools with large population of aliens, and does not take the country of citizenship into consideration in the application process. *Id*. at ¶¶ 7, 16, 18.[9] The only argument Rodriguez has advanced in this case is that the policy is facially-discriminatory—that it is per se unlawful under Section 1981 regardless of intent. Since P&G's policy classifies on the basis of immigration status and not citizenship, and since the Eleventh Circuit has held that DACA recipients are in a different classification from lawfully admitted aliens, the policy is not per se discriminatory.

### 3. P&G's policy is not per se discriminatory based on an equal-protection analysis

The conclusion that P&G's classification of DACA recipients does not violate Section 1981 is supported by the interpretation of the Equal Protection Clause, especially the Eleventh Circuit's recent rejection of an equal-protection challenge to a law discriminating against DACA recipients. *Estrada*, 917 F.3d at 1311-12. As the Supreme Court explained when holding that Section 1981 protects aliens, courts should look at the interpretations of the Fourteenth Amendment, especially the interpretation of the Equal Protection Clause, when determining the scope of the laws adopted under the Amendment, including Section 1981. *Takahashi*, 334 U.S. at 413. Indeed, even *Juarez* acknowledged that courts should look to interpretations of the Equal Protection Clause to determine whether a classification under Section 1981 is facially-discriminatory. *Juarez*, 69 F. Supp. 3d at 372.

---

[9] P&G asks about country of citizenship in the profile section of its online application. Isenhart Dec. at ¶ 12. It does not, however, reject an applicant based on any entry in this category. *Id*.

In *Estrada*, the Eleventh Circuit recently analyzed whether a state policy barring DACA recipients from applying or being admitted to state universities violated the Equal Protection Clause. 917 F.3d at 1308-12. The court first held that DACA recipients, unlike other aliens, are not a "suspect class" that would require strict scrutiny of policies that impacted them. *Id*. at 1308-09. As the court explained, "[t]he Policy does not classify based on a suspect classification because '[u]ndocumented aliens cannot be treated as a suspect class.'" *Id*. It noted that "[w]hile the Supreme Court has said that 'classifications based on alienage . . . are inherently suspect and subject to close judicial scrutiny,' . . . it has never 'held that *all* limitations on aliens are suspect,' . . . let alone limitations on illegal aliens." *Id*. at 1309 (emphasis in original).

The Eleventh Circuit differentiated claims by DACA recipients from claims addressed by the Supreme Court in *Nyquist v. Maucelet*, 432 U.S. 1 (1977) and *Graham v. Richardson*, 403 U.S. 365 (1971):

> But there are two important differences between this case and *Nyquist* and *Graham*. First, *Nyquist* and *Graham* involved state laws that affected *resident* aliens, not *illegal* aliens. Second, as the Supreme Court later clarified, the state laws at issue in *Nyquist* and *Graham* 'struck at the noncitizen's ability to exist in a community, a position seemingly inconsistent with the congressional determination to admit the alien to permanent residence.

*Estrada*, 917 F.3d at 1309 (emphasis in original). The Eleventh Circuit then rejected the equal-protection challenge to Georgia's exclusionary policy. *Id*. at 1310-12. In doing so, the court emphasized that DACA recipients, unlike permanent aliens, are "inadmissible and thus removable." *Id*. at 1310. In fact, the court explicitly held that "refugees, parolees, and asylees [categories of aliens who are not excluded under P&G's policy] are not similarly situated to DACA recipients." *Id*. at 1311. Unlike these other categories of aliens, "[DACA recipients] are not lawfully present in the United States." *Id*.

-14-

Applying the Eleventh Circuit's Equal Protection analysis—indeed, applying its explicit holding—Rodriguez, as a DACA recipient, is not in a suspect class.  Discriminating (classifying) based on his status therefore is not an improper classification under Section 1981.  For this additional reason, P&G's policy is not facially-discriminatory.

### 4. *Juarez* was wrongly decided

Rodriguez has relied mainly on *Juarez* to support his Section 1981 claim.  Like Rodriguez, the plaintiff in *Juarez* was a DACA recipient who was rejected by the defendant based on his DACA status.  He too sued under Section 1981.  The defendant, in turn, claimed that it could properly consider the plaintiff's DACA status.  The district court rejected the defendant's arguments for two main reasons.  First, it noted that an employer cannot discriminate against a subset of a suspect class.  Because it believed that all immigrants were a subset of a protected class (alienage), it held that any classification based on the applicant's immigration status was facially-discriminatory.  69 F. Supp. 3d at 370.  Second, it concluded that the Supreme Court's interpretation of the Equal Protection Clause supported its conclusion.  *Id*. at 372-73.  The district court's analysis was wrong on both counts.

First, an employer may not discriminate against a subset of a protected class because of the protected characteristic.  For example, an employer may not discriminate against individuals with a particular disability because of that disability.  It does not matter if the employer hires other disabled individuals.  But when an employer makes a decision because of another reason, it is not liable under Section 1981, even if some characteristics of the individuals affected correlate perfectly with a protected category.  *See*, *e.g., Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1357-58 (11th Cir. 1999) (affirming grant of summary judgment to employer, holding that the mixed-motive amendments to Title VII do not apply to claims made under section 1981).

It is undisputed that P&G classifies applicants based on temporary immigration or work-authorization status.  It does not classify based on citizenship.  It is undisputed that P&G hires aliens of many different immigration statuses.  Isenhart Dec. at ¶ 18.  It rejected applicants who had not obtained permanent or long-term status in the United States, including those who were not lawfully admitted and were allowed to work only temporarily under a deferred-action program.  Such a classification is based not on citizenship but on immigration status, a distinction recognized in the law.

In fact, it is uncontroverted that employers may discriminate against—may refuse to hire—aliens who require or will require visa sponsorship.  *See* Letter from Deputy Special Counsel, U.S. Department of Justice, Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices, Sept. 27, 2010. (A copy is attached as Exh. 4 to the Notice of Filing Exhibits at D.E. 104.)   Many of these aliens have a temporary lawful status because they are on a current visa.  Yet the law recognizes that an employer may refuse to extend the visa or deny continuing sponsorship for these aliens.  *Id.*  They too are a subset of non-citizens.  They too are all aliens.  Unlike DACA recipients, many were lawfully admitted to the country.  Yet an employer is not required to hire this subset of the alien class.  It follows that an employer is also not required to hire an alien who is not lawfully present in the country, has been given only a temporary reprieve from deportation, and may still be subject to deportation at any time.  *See, e.g., Estrada*, 917 F.3d at 305, 310.  The *Juarez* court's invocation of a noncontroversial principle—that an employer cannot discriminate against a subset of a protected class—conflates causation with correlation, is not based on any applicable precedent, and rejects the long-recognized distinction between immigration and citizenship status.

Second, the *Juarez*'s court's equal-protection analysis has been explicitly contradicted by the Eleventh Circuit. *Juarez* concluded that all aliens were considered a suspect class under the Supreme Court's equal-protection analysis. *See* 69 F. Supp. 3d at 372. It refused to consider the extension of this principle to undocumented aliens, supposing that DACA recipients had legal status. *Id.* at 369 n.7. As P&G explains above, however, the Eleventh Circuit has now directly contradicted this assumption. It held that DACA recipients, unlike permanent and other lawfully present aliens, are not a suspect class. *Estrada*, 917 F.3d at 1308-09. And it held that DACA recipients are not "similarly situated" to permanent aliens, refugees, and asylees. *Id.* at 1311.

This is the exact classification that Rodriguez assails. P&G classifies permanent aliens, refugees, and asylees different from DACA recipients. The Eleventh Circuit held that such a classification does not violate the Equal Protection Clause. *Estrada*, 917 F.3d at 1311. Thus, *Juarez* was wrongly decided, and P&G's policy does not violate Section 1981.

### 5. It is undisputed that Rodriguez would have been rejected for another reason

Even if Rodriguez could establish that P&G's policy is facially-discriminatory, he could not prevail on his Section 1981 claim because it is undisputed that P&G would not have hired him even if he had a permanent work authorization. Even when a plaintiff establishes that an employer discriminated against him based on an impermissible category, the employer will prevail in a Section 1981 claim if it establishes that it would have made the same decision regardless of the discrimination. Unlike Title VII, establishing the "same-decision" (or "mixed-motive") defense absolves the employer of all liability under Section 1981. *Gaston v. Home Depot USA, Inc.*, 129 F. Supp. 2d 1355, 1377 (S.D. Fla. 2001), *aff'd, sub nom. Gaston v. Home Depo USA, Inc.*, 265 F.3d 1066 (11th Cir. 2001). P&G can establish, and Rodriguez cannot dispute, that it would not have hired him regardless of his citizenship.

-17-

As courts in this Circuit have consistently held, "the mixed-motives defense permits a Defendant to prevail in an employment discrimination case even if the plaintiff provides evidence that the defendant was motivated in part by an impermissible consideration in making an adverse employment decision, if the defendant can prove by a preponderance of the evidence that it would have made the same decision even in the absence of the discriminatory consideration." *Gaston*, 129 F. Supp. at 1377. This standard differs from Title VII cases, where the mixed-motives defense allows an employer to avoid damages, but does not prevent the finding of liability against the employer. 42 U.S.C. §§ 2000e-(2)(m), 2000e-5(g)(2)(B); *Harris v. Shelby Cnty. Bd. of Educ.*, 99 F.3d 1078, 1084 (11th Cir. 1996) (explaining that Title VII plaintiffs prevail when it is shown that an impermissible factor motivated the employment decision, "even if there were other, legitimate factors motivating that decision as well."). In Title VII cases, finding that the defendant was motivated at least in part by a discriminatory motive is sufficient to allow equitable relief, including back pay. *Id*. As the Eleventh Circuit has held, however, the amendments to Title VII that allow for the entry of liability in mixed-motive cases do not apply to Section 1981. *Mabra,* 176 F. 3d at 1357-58 (holding that while the 1991 amendments to Title VII prohibit mixed-motive defenses, allowing a Title VII plaintiff to prevail if he can show that the protected class membership was a "motivating factor" of the employment decision, these amendments do not apply to 1981 cases).

Courts outside of the Eleventh Circuit have also consistently found that the 1991 Title VII amendments do not apply to Section 1981 and that the mixed-motive defense remains a complete defense to liability under Section 1981. *See, e.g.*, *Brown v. J. Kaz, Inc*., 581 F.3d 175, 182 n.5 (3d Cir. 2009) (following *Mabra* and holding that mixed-motive is an applicable defense to liability under Section 1981); *Aquino v. Honda of Am., Inc*., 158 F. App'x. 667, 676 (6th Cir. 2005) (rejecting extension of the Title VII mixed motive amendments to § 1981 because "Congress

-18-

inserted the specific statutory provision . . . only into Title VII . . . it did not amend § 1981 in an analogous fashion"); *Hardy v. Town of Greenwich*, 629 F. Supp. 2d 192, 199 (D. Conn. 2009) (holding that while the Second Circuit has not directly addressed whether the 1991 amendments apply to Section 1981, it has determined that the amendments do not apply to other discrimination statutes; finding that mixed motive is an available defense in a Section 1981 claim).

An employer therefore can avoid Section 1981 liability altogether (even liability for equitable relief) if it establishes that it would have taken the same adverse action for an independent non-discriminatory reason. *See Adams v. Tuscaloosa City Bd. of Educ*., 2010 WL 11564929, at *1 (N.D. Ala. Mar. 11, 2010), *report and recommendation adopted*, 2010 WL 11562095 (N.D. Ala. Mar. 31, 2010). In *Adams*, the district court granted summary judgment against a vice principal who sued her school board under Section 1981 after being demoted to a teaching position. The vice principal claimed that she was demoted because of her race. The court found, however, that the ultimate decision maker would have demoted her anyway based on her past poor performance. *Id*. at 12. While the vice principal was demoted at an earlier stage, the fact that the ultimate decision maker would have demoted her anyway sufficed to defeat her Section 1981 claim even if she proved race discrimination. *Id*.

P&G can similarly establish that it would not have hired Rodriguez for an internship regardless of his citizenship. Isenhart was one of the decision makers for the internship Rodriguez sought in 2013. Isenhart Dec. ¶ 14. He helped decide which applicants were hired for the position. *Id*. P&G typically receives over 40,000 applications for internship positions, including over 4,000 for the position that Rodriguez sought. *Id*. ¶¶ 6, 14. Only about 1% of these applicants are hired. *Id*. ¶ 13.

Isenhart has reviewed Rodriguez's application, including his resume. *Id*. ¶ 15. As he attests, he would not have selected Rodriguez for an initial interview. *Id*. The decision makers for this position emphasized prior work experience or internships, especially in accounting or finance. *Id*. They also looked for leadership positions and extracurricular activities. *Id*. As Rodriguez admits, and as is evident from his resume, Rodriguez did not have any prior work experience in accounting or finance; he did not have any prior internship experience; and he had never held leadership positions in any organization. Pl. depo. at 71:10-73:19. As Isenhart explains, given how competitive the selections were, even with a high G.P.A. these gaps in his resume would have sufficed to exclude him from the applicants invited to an initial interview; it certainly would have led to Rodriguez not being one of the twenty-five (out of over 4,000) applicants ultimately hired for this position. *See* Isenhart Dec. ¶15.

Isenhart's conclusion thus stands unrebutted: P&G would not have hired Rodriguez even if he had been a U.S. citizen. *Id*. This suffices to defeat his Section 1981 claim, even if he could establish alienage discrimination.

<u>Conclusion</u>

For the reasons set forth above, P&G is entitled to summary judgment as a matter of law. Dated this 10th day of May, 2019.

Respectfully submitted,

HUNTON ANDREWS KURTH LLP
*Counsel for The Procter and Gamble Company*
Sabadell Financial Center
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
Tel: (305) 810-2500
Fax: (305) 810-2460

By: /s/*Juan C. Enjamio*
    Juan C. Enjamio
    Florida Bar No. 571910
    *jenjamio@huntonak.com*

-20-

## CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of May, 2019, a true and correct copy of the foregoing

was served via ECF on all counsel of record.

By: /s/ *Juan C. Enjamio*