**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No: 1:17-cv-22652-Williams/Torres**

DAVID M. RODRIGUEZ,

      Plaintiff,

vs.

THE PROCTER & GAMBLE COMPANY,

      Defendant.

_____/

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................. 1

FACTUAL BACKGROUND ............................................................................................... 2

I.      The DACA Program ................................................................................................ 2

II.     P&G's Facially Discriminatory Hiring Policy.................................................... 4

III.    P&G Confirms It Screened Out Plaintiff Because He Was a Non-Citizen ........................ 4

ARGUMENT ......................................................................................................................... 5

I.      The Equal Protection *Estrada* Decision Is Inapposite to a Private-Sector Section 1981 Claim ...................................................................................................... 5

      A.    Section 1981 Is Unique in Its Purpose and Structure ............................................. 5

      B.    The State's Interest in Making Class-Based Public Policy Distinctions Is Not Analogous to Private Discrimination in Contracts ................................................. 6

      C.    *Takahashi* Does Not Support P&G's Position......................................................... 8

      D.    Even Under Equal Protection Principles, *Estrada* Is Distinguishable................... 9

II.     P&G's Policy Facially Classifies Based on Alienage as Prohibited by Section 1981...... 10

III.    P&G Has Not Discredited *Juarez* ........................................................................ 12

IV.    P&G Has No "Same Decision" Defense ............................................................... 13

V.     Federal Immigration Law Does Not Immunize P&G from Liability .............................. 16

CONCLUSION...................................................................................................................... 17

## TABLE OF AUTHORITIES

**Cases**                                                                      **Page(s)**

*Adams v. Tuscaloosa City Bd. of Educ.*,
   No. 08 Civ. 1061, 2010 WL 11564929 (N.D. Ala. Mar. 11, 2010)........................................15

*Anderson v. Conboy*,
   156 F.3d 167 (2d Cir. 1998)..........................................................................................................9

*Ariz. DREAM Act Coal. v. Brewer*,
   757 F.3d 1053 (9th Cir. 2014) .....................................................................................................2

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) .......................................................................................................9

*Ayiloge v. City of New York*,
   No. 00 Civ. 5051, 2002 WL 1424589 (S.D.N.Y. June 28, 2002)............................................12

*Batalla Vidal v. Nielsen*,
   279 F. Supp. 3d 401 (E.D.N.Y. 2018) ........................................................................................3

*Brown v. J. Kaz, Inc.*,
   581 F.3d 175 (3d Cir. 2009).......................................................................................................14

*Burrell v. Bd. of Tr. of Ga. Military Coll.*,
   125 F.3d 1390 (11th Cir. 1997) .................................................................................................15

*Burton v. City of Belle Glade*,
   178 F.3d 1175 (11th Cir. 1999) .................................................................................................14

*Camara v. Schwan's Food Mfg., Inc.*,
   No. 04 Civ. 121, 2005 WL 1950142 (E.D. Ky. Aug. 15, 2005)...............................................12

*Campbell v. Civil Air Patrol*,
   138 Fed. App'x 201 (11th Cir. 2005) ........................................................................................15

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
   No. 18 Civ. 521, --- F. 3d ----, 2019 WL 2147204 (4th Cir. May 17, 2019) ............................3

*Castleberg v. City of Dallas*,
   No. 09 Civ. 1354, 2011 WL 2559521 (N.D. Tex. June 3, 2011)..............................................16

*Christensen v. Harris Cty.*,
   529 U.S. 576 (2000).....................................................................................................................17

*Coyotl v. Kelly*,
   261 F. Supp. 3d 1328 (N.D. Ga. 2017) .......................................................................................3

*Epic Systems Corp. v. Lewis,*
   138 S. Ct. 1612 (2018) ............................................................................................................17

*Estrada v. Becker,*
   917 F.3d 1298 (11th Cir. 2019) ................................................................................... *passim*

*Everts v. Sushi Brokers LLC,*
   247 F. Supp. 3d 1075 (D. Ariz. 2017) ...................................................................................16

*Ferrill v. Parker Grp., Inc.,*
   168 F.3d 468 (11th Cir. 1999) ..................................................................................................6

*Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania,*
   458 U.S. 375 (1982)...................................................................................................................5

*Gorzynski v. JetBlue Airways Corp.,*
   596 F.3d 93 (2d Cir. 2010)......................................................................................................13

*Gross v. FBL Fin. Serv's, Inc.,*
   557 U.S. 167 (2009)................................................................................................................14

*Jefferies v. Harris Cty. Cmty. Action Ass'n,*
   615 F.2d 1025 (5th Cir. 1980) ...............................................................................................13

*Jett v. Dallas Indep. Sch. Dist.,*
   491 U.S. 701 (1989)..................................................................................................................5

*Jones v. Alfred H. Mayer Co.,*
   392 U.S. 409 (1968)..................................................................................................................6

*Juarez v. Nw. Mut. Life Ins. Co., Inc.,*
   69 F. Supp. 3d 364 (S.D.N.Y. 2014)................................................................................11, 12

*Mabra v. United Food & Commercial Workers Local Union No. 1996,*
   176 F.3d 1357 (11th Cir. 1999) .............................................................................................13

*Miles v. M.N.C. Corp.,*
   750 F.2d 867 (11th Cir. 1985) ...............................................................................................14

*Mora v. Jackson Mem'l Found., Inc.,*
   597 F.3d 1201 (11th Cir. 2010) .............................................................................................14

*NAACP v. Trump,*
   298 F. Supp. 3d 209 (D.D.C. 2018) .........................................................................................4

*NAACP v. Trump,*
   315 F. Supp. 3d 457 (D.D.C. 2018) .........................................................................................4

*Nat'l Assoc. of African American-Owned Media v. Charter Commc'ns,*
   915 F.3d 617 (9th Cir. 2019) ..................................................................................................14

*Pac. Shores Prop., LLC v. City of Newport Beach,*
   730 F.3d 1142 (9th Cir. 2013) ................................................................................................13

*Perez v. Wells Fargo & Co.,*
   No. 17 Civ. 454, 2017 WL 3314797 (N.D. Cal. Aug. 3, 2017)..............................................11

*Plyler v. Doe,*
   457 U.S. 202 (1982)..........................................................................................................6, 10

*Quigg v. Thomas Cty. Sch. Dist.,*
   814 F.3d 1227 (11th Cir. 2016) ..............................................................................................16

*Regents of Univ. of Cal. v. U. S. Dep't of Homeland Sec.,*
   279 F. Supp. 3d 1011 (N.D. Cal. 2018) ...........................................................................2, 3, 4

*Regents of Univ. of Cal. v. U. S. Dep't of Homeland Sec.,*
   908 F. 3d 476 (9th Cir. 2018) ...................................................................................... *passim*

*Rodriguez v. Procter & Gamble Co.,*
   338 F. Supp. 3d 1283 (S.D. Fla. 2018) ...........................................................................5, 8, 12

*Runyon v. McCrary,*
   427 U.S. 160 (1976)............................................................................................................5, 6

*Scully v. Summers,*
   No. 95 Civ. 9091, 2000 WL 1234588 (S.D.N.Y. Aug. 30, 2000) ..........................................16

*Speedy v. Rexnord Corp.,*
   243 F.3d 397 (7th Cir. 2001) ..................................................................................................15

*Steger v. Gen. Elec. Co.,*
   318 F.3d 1066 (11th Cir. 2003) ..............................................................................................15

*Takahashi v. Fish & Bone Comm'n,*
   334 U.S. 410 (1948)............................................................................................................8, 9

*Talwar v. Staten Island Univ. Hosp.,*
   No. 12 Civ. 0033, 2014 WL 5784626 (E.D.N.Y. Mar. 31, 2014) ..........................................12

*Texas v. United States,*
   328 F. Supp. 3d 662 (S.D. Tex. 2018) .....................................................................................9

*Toll v. Moreno,*
   458 U.S. 1 (1982)....................................................................................................................9

*Truax v. Raich,*
    239 U.S. 33 (1915)......................................................................................................10

*United Auto. Workers v. Johnson Controls, Inc.,*
    499 U.S. 187 (1991)....................................................................................................13

*United States v. Metcalf,*
    881 F.3d 641 (8th Cir. 2018) ........................................................................................5

*United States v. Nelson,*
    277 F.3d 164 (2d Cir. 2002)...........................................................................................6

*Univ. of Tex. Sw. Med. Ctr. v. Nassar,*
    570 U.S. 338 (2013)....................................................................................................14

*Unthaksinkun v. Porter,*
    No. 11 Civ. 588, 2011 WL 4502050 (W.D. Wash. Sept. 28, 2011) ..........................11

*Vaughn v. City of New York,*
    No. 06 Civ. 6547, 2010 WL 2076926 (E.D.N.Y. May 24, 2010) .............................12

**Statutes**

8 U.S.C. § 1324(a) ...............................................................................................................2, 7

8 U.S.C. § 1324(b) ...................................................................................................................16

42 U.S.C. § 1981........................................................................................................................6

**Other Authorities**

8 CFR § 274a.12(c)(14) .........................................................................................................7-8

President Barack Obama, Remarks by the President on Immigration (June 15,
    2012), https://obamawhitehouse.archives.gov/the-press-
    office/2012/06/15/remarks-president-immigration (last visited June 6, 2019)..........................2

President Barack Obama, Remarks by the President in Address to the Nation on
    Immigration (Nov. 20, 2014), https://obamawhitehouse.archives gov/the-
    press-office/2014/11/20/remarks-president-address-nation-immigration (last
    visited June 6, 2019) .................................................................................................8

U.S. Soc. Sec. Admin., *Social Security Number and Card – Deferred Action for
    Childhood Arrivals*, https://www.ssa.gov/pubs/deferred_action (last visited
    June 6, 2019)................................................................................................................3

USCIS, Number Form I-821D, Consideration of Deferred Action for Childhood
      Arrivals, by Fiscal Year, Quarter, Intake, and Case Status: Fiscal Year 2012-
      2018 (Sept. 30, 2018), https://www.uscis.gov/sites/default/files
      /USCIS/Resources/Reports%20and%20Studies/Immigration%20Forms%20D
      ata/All%20Form%20Types/DACA/daca_performance_data_fy2018_qtr4.pdf
      (last visited June 6, 2019) ...........................................................................................................3

**INTRODUCTION**

The Procter & Gamble Company ("P&G") seeks summary judgment on Plaintiff's Section 1981 claim even though it concedes that it (a) has a corporate policy that categorically excludes from employment work-authorized non-U.S. citizens who are not permanent residents, refugees, or asylees; (b) outright rejected Plaintiff's employment application under this policy; and (c) failed to consider Plaintiff's qualifications and work experience at the time he applied because of the categorical exclusion.

These concessions force P&G to rely on alternative theories for dismissal, none of which approaches viability. P&G relies primarily on the Eleventh Circuit's recent decision in *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), which was a Fourteenth Amendment decision that resolved only how the U.S. Constitution may constrain state government from classifying non-citizens who qualify for public benefits. The Eleventh Circuit did not reach or even consider whether Section 1981 protects work-authorized non-citizens from private employment discrimination.

P&G's heavy reliance on *Estrada* illustrates its failure to understand the significance of both the Deferred Action for Childhood Arrival ("DACA") program and Section 1981. Most critically, the significance of DACA is not that it creates *substantive* rights, but that it permits holders to *legally* enter into employment contracts otherwise prohibited by the Immigration Reform and Control Act of 1986 ("IRCA"). Whether DACA holders are "lawfully present" for the purposes of Georgia college admissions does not alter their right to enter employment contracts equal to citizens under Section 1981.

P&G also claims that its corporate policy classifies based on immigration status, but of course it is *non-citizenship* (often referred to as alienage) that is the relevant protected characteristic under Section 1981. Further, P&G's policy expressly excludes a subset of work-authorized non-U.S. citizens from employment. This Court has already concluded that such an exclusion constitutes actionable discrimination. Finally, P&G has no "same-decision" defense available to it, but even assuming it did, the defense would fail as a matter of law because an employer may not prevail on the "same-decision" defense by offering a reason that did not motivate it at the time of the adverse decision.

1

**FACTUAL BACKGROUND**

## I.    The DACA Program.

On June 15, 2012, President Obama announced that the U.S. Department of Homeland Security ("DHS") would allow non-citizens who entered the United States as children and who met certain requirements to apply for work authorization and relief from deportation proceedings through the DACA program.[1]  The purpose of DACA is to "[stop] expel[ling] talented young people, who . . . [have] been raised as Americans; understand themselves to be part of this country . . . [and] *who want to staff our labs, or start new businesses*, or defend our country."[2] *See Regents of Univ. of Cal. v. U. S. Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011, 1031 (N.D. Cal. 2018) ("DACA allows enrollees to better their careers and lives with a reduced fear of removal.  DACA work authorizations, for example, allow recipients to join in the mainstream economy (and pay taxes).") ("*Regents I*"), *aff'd* 908 F. 3d 476 (9th Cir. 2018) ("*Regents II*").  Thus, while DACA holders may not be considered "lawfully present" for *all* purposes, they are undisputedly lawfully authorized to work and eligible to compete for private employment. *See* 8 U.S.C. § 1324a(h)(3) (defining "unauthorized alien," for employment purposes, as a non-citizen who is neither a lawful permanent resident nor "authorized to be ... employed by this chapter or by the Attorney General"); 8 U.S.C. § 1324(a)(b)(1)(C)(ii) (a document is valid as evidence of work authorization if "the Attorney General finds [it], by regulation, to be acceptable" for that purpose); *Ariz. DREAM Act Coal. v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014) ("[T]he Executive Branch has determined that deferred action recipients—including DACA recipients—are ordinarily authorized to work in the United States.").

In addition to meeting age, continuous presence, and educational or military requirements, DACA applicants are required to submit extensive personal information to DHS and undergo biometric screening and background checks.[3]  If approved, DACA applicants are granted

---

[1]    President Barack Obama, Remarks by the President on Immigration (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration (last visited June 6, 2019).

[2]    *Id.*  (emphasis added).

[3]    To qualify for DACA, applicants must (1) have entered the United States when they were under 16 years of age; (2) have continuously resided in the United States for at least five years preceding June 15, 2012; (3) be a current student or have graduated from high school, obtained a general education development certificate, or be an honorably discharged veteran of the United States Coast Guard or Armed Forces; (4) have not been convicted of a felony offense, a

renewable deferred action and are also eligible to work legally and "operat[e] in the above-ground economy." *Regents II*, F. 3d at 486. In fact, "DACA recipients are *required* to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain 'productive' members of society." *Id.* (quoting *Brewer*, 757 F.3d at 1062).

DACA holders are also eligible to receive Social Security numbers, enabling them to identify themselves for employment and other contractual purposes.[4] As of September 30, 2018, United States Citizenship and Immigration Services ("USCIS") has approved over 2.1 million initial and renewal requests for DACA, and has granted DACA to over 800,000 individuals.[5]

Despite subsequent attempts to rescind DACA, the program remains fully in effect for all individuals who, like Plaintiff, were approved for the program prior to September 5, 2017. *See Regents I*, 279 F. Supp. 3d at 1048 (ordering DHS to "maintain the DACA program on a nationwide basis on the same terms and conditions as were in effect before the [attempted] rescission… including allowing DACA enrollees to renew their enrollments"); *Casa De Md.*, 2019 WL 2147204, at *15 (4th Cir. May 17, 2019) ("Our decision today restores DACA to its pre-[rescission] status[.]").[6]

---

significant misdemeanor offense, or multiple misdemeanor offenses, or otherwise pose a threat to national security or public safety; and (5) have been 30 years of age or younger as of June 15, 2012. *Regents II* (citing Memorandum from Secretary of Homeland Security Janet Napolitano re, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children" (June 15, 2012) https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf); *see also id.* (applicants must provide photographs, fingerprinting and extensive biographical and biometric background checks and be individually evaluated and approved by DHS personnel); *Coyotl v. Kelly*, 261 F. Supp. 3d 1328, 1334 (N.D. Ga. 2017) (stating requirements), *reconsideration denied*, 2017 WL 4956419 (N.D. Ga. July 31, 2017).

[4]   *See* U.S. Soc. Sec. Admin., *Social Security Number and Card – Deferred Action for Childhood Arrivals*, https://www.ssa.gov/pubs/deferred_action (DACA holders may apply for a Social Security number after receiving Employment Authorization Card).

[5]   USCIS, Number Form I-821D, Consideration of Deferred Action for Childhood Arrivals, by Fiscal Year, Quarter, Intake, and Case Status: Fiscal Year 2012-2018 (Sept. 30, 2018), https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigrat ion%20Forms%20Data/All%20Form%20Types/DACA/daca_performance_data_fy2018_qtr4.pd f (last visited June 6, 2019).

[6]   Other courts nationwide have rejected DHS's attempt to rescind DACA following the election of President Trump and change in administrations. *See Casa De Md. v. U.S. Dep't of Homeland Sec.*, No. 18 Civ. 521, --- F. 3d ----, 2019 WL 2147204, at *14 (4th Cir. May 17, 2019) ("[W]e hold that [DHS's] decision to rescind DACA was arbitrary and capricious and must be set aside"); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401, 420 (E.D.N.Y. 2018) (same);

II.     **P&G's Facially Discriminatory Hiring Policy.**

P&G does not dispute that its "U.S. policy" requires that applicants for employment must have not just federal work authorization but "unrestricted long-term work authorization." Plaintiff's Additional Statement of Material Facts ("ASMF") ¶ 62.   Accordingly, the only non-citizens whom P&G prefers to hire for U.S. based positions, including summer internships are permanent residents.   *Id.* ¶ 63.   All other work-authorized non-citizens are ineligible for employment under P&G's policy. *See* Plaintiff's Counter-Statement of Material Facts ("CSMF") ¶¶ 30-33.

P&G's reasoning for its "U.S. policy" confirms the discriminatory bias underlying it. P&G contends that its policy to only hire non-citizens if they have a Green Card is meant to foster its "develop from within" model.  CSMF ¶ 6.  Despite this stated hiring goal, P&G made no effort at the application stage to screen (or even *consider* screening) citizens to assess the stability of their own future employment plans. *See* ASMF ¶ 64.  Further, P&G admits that it equates citizenship with cultural and linguistic familiarity. *Id.* ¶ 65.

III.    **P&G Confirms It Screened Out Plaintiff Because He Was a Non-Citizen.**

P&G confirms that it automatically rejected Plaintiff because he indicated he was a non-citizen who was *not* "lawfully admitted for permanent residence, OR a refugee, OR an individual granted asylum, OR admitted for residence as an applicant under the 1986 immigration amnesty law." *Id.* ¶ 67.  After Plaintiff followed up with P&G and confirmed that he did not need employer sponsorship to work lawfully in the United States, he was told he was ineligible to be hired by P&G because, "per P&G policy, applicants in the U.S. should be legally authorized to work with no restraints on the type, duration, or location of employment." *Id.* ¶ 68.  Plaintiff then received a formal rejection from P&G. *Id.* ¶ 69.

P&G does not and could not plausibly argue that it rejected Plaintiff *because of* any specific immigration status because P&G had no opportunity to consider Plaintiff's participation in DACA. *Id.* ¶ 70.  P&G's screening question in effect in 2013 did not elicit this information. *Id.*  Instead,

_____

*NAACP v. Trump,* 298 F. Supp. 3d 209, 243 (D.D.C. 2018) (same); *NAACP v. Trump*, 315 F. Supp. 3d 457 (D.D.C. 2018) (same, following DHS's issuance of supplemental explanatory memorandum); *Regents I,* 279 F. Supp. 3d at 1029-32, 1037-49 (same, noting "widespread harm" that would be incurred "by plaintiffs and our economy" in the event that DACA recipients lost the ability to work, support their families, pay taxes and enroll in health insurance); *Regents II,* 908 F. 3d at 510 (same).

P&G determined only that Plaintiff was neither a U.S. citizen nor fell into one of several designated acceptable immigration categories ("alien lawfully admitted for permanent residence," "refugee," "granted asylum, admitted for residence as an applicant under the 1986 immigration amnesty law"). *Id.* A work-authorized non-citizen who is not in one of these select categories was instantly excluded from consideration. *Id.* ¶ 71.

Further, it is undisputed that P&G failed to consider Plaintiff's qualifications at the time he applied. *Id.* ¶ 70. P&G instantly excluded Plaintiff and therefore, did not consider Plaintiff's background, credentials, or qualifications at the time he applied. Mr. Isenhart admits to only reading the application during this litigation. *Id.* ¶ 72.

## ARGUMENT

### I.   The Equal Protection *Estrada* Decision Is Inapposite to a Private-Sector Section 1981 Claim.

P&G previously conceded that Rodriguez, as a DACA holder, was a member of a protected class for purposes of Section 1981. *See Rodriguez v. Procter & Gamble Co.*, 338 F. Supp. 3d 1283, 1286 (S.D. Fla. 2018) (P&G "does not dispute that [Plaintiff] sufficiently alleges" that he is a member of a protected class). The Eleventh Circuit's recent decision in *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), does not lead to a different result.

#### A.   Section 1981 Is Unique in Its Purpose and Structure.

P&G argues that Section 1981 does not protect DACA holders because *Estrada* held that they are not "lawfully present" in the context of an exclusively *Fourteenth* Amendment challenge. P&G Mot. for Summary Judgment ("P&G Mot.") at 7. But *Estrada* had no occasion to consider the scope of Section 1981, which (at least as applied to private parties) is also *Thirteenth* Amendment legislation. *See Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 722 (1989) (plurality) (describes Section 1981 as "both a Thirteenth and a Fourteenth Amendment statute"); *Gen. Bldg. Contractors Ass'n, Inc. v. Pennsylvania*, 458 U.S. 375, 384-86 (1982) (Section 1981, as amended by Enforcement Act of 1870, reflects both amendments); *Runyon v. McCrary*, 427 U.S. 160, 179 (1976) ("Section 1981, as applied to the conduct at issue here, constitutes an exercise of federal legislative power under § 2 of the Thirteenth Amendment").

Congress's Thirteenth Amendment § 2 power to legislate is sweeping and distinct from its Fourteenth Amendment § 5 authority; the latter does not bind the former. *See United States v. Metcalf*, 881 F.3d 641, 644-45 (8th Cir. 2018) (distinguishing the two sources of Congressional power under the Reconstruction Amendments, noting that Thirteenth Amendment legislation is

not limited by Equal Protection decisional law); *United States v. Nelson*, 277 F.3d 164, 185 & n.20 (2d Cir. 2002) (describing history of Congress's "expansive enforcement power" under § 2, and noting that the Supreme Court's Fourteenth Amendment authority does "not refer to the Thirteenth Amendment context and hence cannot be read by us as applying to that context or as undermining the foundational principle that Congress's enforcement power under Section Two of the Thirteenth Amendment extends well beyond the scope of the direct prohibitions contained in Section One"). *See generally Jones v. Alfred H. Mayer Co.*, 392 U.S. 409, 439 (1968) ("By its own unaided force and effect, the Thirteenth Amendment abolished slavery, and established universal freedom. Whether or not the Amendment itself did any more than that … it is at least clear that the Enabling Clause of that Amendment empowered Congress to do much more.  For that clause clothed Congress with power to pass all laws necessary and proper for abolishing all badges and incidents of slavery in the United States.") (internal quotation marks and citation omitted).

While Equal Protection principles may be analogous to Section 1981 for some purposes, there are also material differences that limit the applicability of Equal Protection reasoning.  First, the Thirteenth Amendment (and Section 1981) extends to private parties.  *Runyon*, 427 U.S. at 168-70.  As discussed further *infra*, the public policy justifications available to state governments under the Fourteenth Amendment are therefore not applicable to discrimination carried out by private parties under Section 1981.  Second, in crafting Section 1981, Congress chose (under its expansive Thirteenth Amendment enforcement power) to safeguard the contract rights of all *persons* relative to "*white citizens*."[7] (emphasis added).  *Cf. Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("[A]n alien is surely a 'person' in any ordinary sense of that term.").  The express reach of Section 1981 is thus broader than just non-citizens who have Green Cards or other special status, as P&G would have it.  Third, under Section 1981, Congress made no exceptions to excuse intentional discrimination such as bona fide occupational qualification or business necessity, nor did it sanction any form of "rational basis" defense.  *See Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 473-74 (11th Cir. 1999) (such defenses are "never available to the § 1981 defendant").

**B.    The State's Interest in Making Class-Based Public Policy Distinctions Is Not Analogous to Private Discrimination in Contracts.**

---

[7]    42 U.S.C. § 1981. ("All persons within the jurisdiction of the United States shall have the same right in every State…to make and enforce contracts…as is enjoyed by white citizens…").

*Estrada* does not have relevance here because it resolved only how the U.S. Constitution may constrain *state government* from classifying non-citizens who qualify for public benefits. The Eleventh Circuit expressly did not reach—nor even consider—whether private parties may discriminate against non-citizens in the making or enforcement of contracts under Section 1981. In *Estrada*, the Eleventh Circuit held only that Georgia's policy of verifying students' "lawful presence" in the United States survived "rational basis" analysis under the Equal Protection Clause of the Fourteenth Amendment. 917 F.3d at 1312. In reaching this conclusion, the Eleventh Circuit found that DACA holders could not establish they were similarly situated to students who may demonstrate eligibility for federal financial aid, as determined by Congress. *Id.* at 1311.[8] *Estrada*, therefore, does not rest on the standalone definition or significance of "lawful presence".[9] It rests instead on DACA holders' lack of entitlement to federal student aid relative to other non-citizen students. *Id* at 1311.

Moreover, *Estrada* addresses access to seats at state universities, a topic on which DACA has no direct bearing. *Estrada*, 917 F. 3d at 1306 (DACA does not give "deferred action holders the right to attend state universities or colleges"). Thus, while Georgia might rest its policy on the "rational basis" that it chose to "prioritize those students who are more likely to stay in Georgia after graduation," *Estrada*, 917 F.3d at 1311—because Equal Protection (according to that decision) allows state governments to make such classifications—P&G has no comparable defense under Section 1981. By contrast here, there is no dispute that Plaintiff was lawfully authorized to work in the U.S. at the relevant time and P&G risked no compliance issues by considering him for employment or hiring him.[10] *See Regents II*, 908 F.3d at 486 ("DACA also allows recipients to

---

[8]     The Court's conclusion that Georgia's policy neither impermissibly regulated immigration nor was preempted similarly rested on the observation that neither the Immigration and Nationality Act ("INA") nor Georgia's policy expressly defined "lawful presence" but instead sought to "verify" lawful presence by "borrow[ing] from federal standards to verify lawful presence." *Id.* (citing examples of lawful status under the INA and citing 20 U.S.C. § 1091, which sets forth federal student aid eligibility.)

[9]     In fact, the *Estrada* Court began its analysis of Georgia's college admissions program by noting that "lawfully present" is not a standalone immigration classification, and it is not defined anywhere in the Act." *Id.* at 1304.

[10]    *See* 8 U.S.C. § 1324(a) (prohibiting the hiring or recruitment of an unauthorized alien); *id.* § 1324a(h)(3) (defining "unauthorized alien" to exclude lawful permanent residents or aliens authorized to be employed by this chapter or by the attorney general"); 8 CFR § 274a.12(c)(14) (authorizing deferred action holders to receive work authorization upon showing of economic necessity).

apply for authorization to work in this country legally"). Unlike the plaintiffs in *Estrada*, here there is no dispute that DACA holders, like Plaintiff, have work authorization.[11] and are similarly situated to other whom P&G considers for employment as having legal status to work.

Estrada does not disturb what this Court already found: that DACA holders are a protected class of non-citizens under Section 1981. *Rodriguez*, 338 F. Supp. 3d at 1286.

P&G also argues that alienage classifications become unacceptable only where they "[strike] at the noncitizen's ability to exist in a community." *Estrada*, 917 F.3d at 1309. If anything, that is just what the DACA program is meant to accomplish: to allow non-citizens like Plaintiff to work and earn a living, pay taxes, engage in commerce and with his community, and not have to hide in the shadows. *Regents II*, 908 F.3d at 486 (DACA allows participants to operate in the "above-ground economy"); Remarks of Pres. Obama, Nov. 20, 2014, https://obamawhitehouse.archives gov/the-press-office/2014/11/20/remarks-president-address-nation-immigration (participants "can come out of the shadows and get right with the law"). Thus, unlike public benefits in the form of a reduced-tuition at state-funded colleges, the ability to seek private employment on equal footing is precisely the way DACA enables participants to exist in the community. P&G undermines the purpose of the DACA program by categorically refusing to contract with DACA holders for employment.

## C.   *Takahashi* Does Not Support P&G's Position.

P&G's other authority is distinguishable. P&G asserts that "Section 1981 does not protect aliens who are not lawfully present in the United States," and cites to *Takahashi v. Fish & Bone Comm'n*, 334 U.S. 410 (1948). But *Takahashi* clearly does not support that conclusion. The decision merely notes, without explanation, that respondent was "lawfully" admitted and entitled to enjoy the "equality of legal privileges" conferred by the state under the Fourteenth Amendment. *Id.* at 420. The Court thus had no occasion to make the finding P&G infers here, that Section 1981 *does not protect* DACA holders who are lawfully authorized to work in this country from private employment discrimination. If anything, the Court's express language suggests the opposite. *See id.* at 419-20 ("The protection of [Section 1981] has been held to extend to aliens as well as to citizens" as it protects "all persons against state legislation bearing unequally upon them either because of alienage or color.").

---

[11]   Indeed, DACA applicants are required to apply for work authorization as a condition of receiving DACA. *See supra* Section I.

Although relying on both Equal Protection and pre-emption principles, *Takahashi* is better understood as a federal preemption case about a state's ban on non-citizen commercial fishing, immaterial to a claim of private discrimination. *Toll v. Moreno*, 458 U.S. 1, 11 n.16 (1982) ("*Takahashi*…[is] better explained in pre-emption than in equal protection terms"); *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 973 (9th Cir. 2017) (Kozinski, J., dissenting) (same). If anything, under the reasoning of *Takahashi*—that states do not have the same latitude as the federal government to impose federal immigrant classifications on residents—*Estrada* was wrongly decided (an argument preserved here as a good-faith basis of reversal). *Compare Takahashi*, 334 U.S. at 420 ("The state's law here cannot be supported in the employment of this legislative authority because of policies adopted by Congress in the exercise of its power to treat separately and differently with aliens from countries composed of peoples of many diverse cultures, races, and colors. For these reasons the power of a state to apply its laws exclusively to its alien inhabitants as a class is confined within narrow limits."); *with Estrada*, 917 F.3d at 1311 (using federal immigration classifications to justify policy against Equal Protection challenge). In any event, if states lack the range of power under the U.S. Constitution to discriminate against non-citizens that the federal government may exercise, surely private companies have no more power.

More importantly, neither the Supreme Court in *Takahashi* nor the Second Circuit in *Anderson* had occasion to decide whether a non-citizen who is *legally authorized* to work in the United States—under a specified executive policy, one that remains in effect by court order.[12]— may suffer private employment discrimination owing to alienage. *Anderson v. Conboy*, 156 F.3d 167 (2d Cir. 1998). The *Anderson* court clarifies this distinction: "[i]f an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage *but of noncompliance with federal law*." *Anderson*, 156 F.3d at 180 (emphasis added). Here, Plaintiff *is indisputably* in compliance with federal law by registering under DACA and obtaining federal work authorization, so that rationale is unavailable to P&G.

**D.     Even Under Equal Protection Principles, *Estrada* Is Distinguishable.**

While Equal Protection analysis is not dispositive here for the reasons discussed *supra*, *Estrada* is distinguishable for another reason. The Supreme Court recognizes that Equal Protection

---

[12]   *Regents II*, 908 F. 3d at 486; *Texas v. United States*, 328 F. Supp. 3d 662, 742 (S.D. Tex. 2018) (refusing to enjoin DACA program).

protects some essential societal interests for non-resident aliens who were brought to the U.S. as children. Even if they had not been granted "deferred action," non-resident aliens possess "inchoate federal permission to remain" and thus remain part of the community. *Plyler*, 457 U.S. at 226 (state cannot determine whether "any particular undocumented child will in fact be deported" and cannot justify the denial of education on that basis); *see also id.* at 224-30 (rejecting argument that children's "undocumented status," or the state's interest in preserving resources for children more likely to contribute to state's long-term economy, constitute rational basis for denial of education). Here, this rationale is compelling, because DACA participants—who, by the terms of the program, were also brought to the United States as children—are expressly protected from deportation for renewable periods while they remain in the program.

Just as access to primary "education has a fundamental role in maintaining the fabric of our society," *id.* at 221, the Supreme Court long ago recognized that the ability to earn a living rises to constitutional dignity, *Truax v. Raich*, 239 U.S. 33, 41 (1915) ("right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of [Equal Protection] to secure"; overturning law that imposed quota on aliens in private employment).[13] P&G ignores this binding precedent in solely highlighting *Estrada*, which is not analogous in any event.

## II. P&G's Policy Facially Classifies Based on Alienage as Prohibited by Section 1981.

P&G contends that its policy is not facially discriminatory "because P&G classified applicants based on immigration status—specifically, their deferred-action status—not citizenship." P&G Mot. at 10-13. This is manifestly incorrect: P&G's policy never specified DACA or any other particular immigration status for exclusion. P&G nowhere disputes that it broadly screened out *all* non-citizens *unless* they were Green Card holders, refugees, or asylees. *Id.* at 11. As P&G itself described the policy, it "asked applicants if they were U.S. citizens or fell within several immigration categories, including permanent aliens, refugees, or asylees." *Id.* Applicants who "did not fall into any of these categories—mostly those who needed visa sponsorship or who had not been lawfully admitted, such as DACA or Temporary Protected Status (TPS) recipients—*were rejected automatically.*" *Id.* (emphasis added). Thus, all U.S. citizens

---

[13]   For deprivation of such interests, the Eleventh Circuit in *Estrada*, 917 F.3d at 1309 n.13, notes that *Plyler* imposes a "heightened rational basis review," a standard that P&G nowhere argues.

were "in," and all non-U.S. citizens were automatically "out" unless expressly excepted. Most critically for purposes of this motion, P&G admits that it screened out Plaintiff *because he was not a citizen, Green Card holder, refugee or asylee*, and *not* because of his specific immigration status as a DACA holder. *Id.* at 4 ("Rodriguez's online application . . . was rejected based on his answer to a question that asked whether he was a U.S. citizen, a permanent resident, refugee, or asylee.")

P&G claims in passing to have cleaned up the problem by changing its policy for "the last two years" though it only references changing its *prescreening questions*, not the underlying policy itself. *Id.* at 11 n.8. This argument fails for two reasons. First, P&G has presented no evidence that its actual policy has changed, while Plaintiff has offered ample evidence that the underlying policy remains fully in effect. Pl.'s Reply to Def.'s Opp'n to Class Certification ("Reply Br."), ECF No. 112, at 6-7. Moreover, even if P&G had changed its policy in "the last two years," any such change is irrelevant on summary judgment, of course, because P&G concedes it "automatically rejected" Plaintiff under its *old* policy. P&G Mot. at 4, 11.

P&G's policy is thus an express ban on at least a subset of work-authorized non-U.S. citizens, rendering it indistinguishable from other blanket bans on work-authorized non-citizens that have been successfully challenged under Section 1981. *See Juarez v. Nw. Mut. Life Ins. Co., Inc.*, 69 F. Supp. 3d 364, 365-66 (S.D.N.Y. 2014) (sustaining a challenge to a "blanket ban against hiring anyone who is not a U.S. citizen or U.S. permanent resident"); *Perez v. Wells Fargo & Co.*, No. 17 Civ. 454, 2017 WL 3314797, at *1, *4 (N.D. Cal. Aug. 3, 2017) (sustaining challenge to corporate policy of refusing to extend loans to applicants who were not U.S. citizens or permanent residents meeting specified criteria); *see also Unthaksinkun v. Porter*, No. 11 Civ. 588, 2011 WL 4502050, at *2, *24 (W.D. Wash. Sept. 28, 2011) (concluding that plaintiffs were likely to succeed on the argument that a health plan that only covered U.S. citizens or "qualified non-citizen[s]," i.e., "lawfully admitted permanent residents, aliens who have been granted asylum, and refugees," was facially discriminatory).

P&G also relies on irrelevant cases. In *Camara*, the employee limited her claim to discrimination because of a *specified* immigration status, i.e., on the basis of being an asylee. *Camara v. Schwan's Food Mfg., Inc.*, No. 04 Civ. 121, 2005 WL 1950142, at *6 (E.D. Ky. Aug. 15, 2005); *see Rodriguez*, 338 F. Supp. 3d at 1287 n.2 ("[T]he plaintiff in *Camara* did not allege alienage discrimination in the complaint"). By contrast, Plaintiff sues on behalf of *all* work-authorized non-U.S. citizens, regardless of immigration status, who do not fall into P&G's express

11

exceptions.  P&G's other two cases did not decide where to draw the dividing line between immigration status and alienage because the plaintiffs failed to raise *any* inference of *any* kind of discrimination on the facts.  *See Talwar v. Staten Island Univ. Hosp.*, No. 12 Civ. 0033, 2014 WL 5784626, at *7 (E.D.N.Y. Mar. 31, 2014) (noting that the plaintiff was fired because of the "Hospital's requirement that [she] obtain an unlimited medical license," which itself "does not raise an inference of discrimination on the basis of alienage"), *vacated in part on other grounds*, 610 F. App'x 28 (2d Cir. 2015); *Vaughn v. City of New York*, No. 06 Civ. 6547, 2010 WL 2076926, at *16 (E.D.N.Y. May 24, 2010) (entering summary judgment for defendants where plaintiff failed to identify comparators treated differently with respect to discipline on the basis of race or alienage).  Finally, in *Ayiloge v. City of New York*, No. 00 Civ. 5051, 2002 WL 1424589, at *16 (S.D.N.Y. June 28, 2002), the plaintiff simply failed to present any evidence of his citizenship. *Id.* ("there was simply no testimony as to Ayiloge's actual citizenship," nor "any evidence indicating that Defendants believed that he was not a citizen of the United States"); *see Rodriguez*, 338 F. Supp. 3d at 1287 n.2 (finding same cases distinguishable on their facts).

### III.   P&G Has Not Discredited *Juarez*.

P&G seeks to reargue the decision in *Juarez*, which this Court cited as persuasive authority. In denying Defendant's motion to dismiss, this Court rejected P&G's critique and, obviously, the *Juarez* decision itself has not changed.  P&G's analysis is as meritless now as it was then.

P&G argues that, while "an employer may not discriminate against a subset of a protected class because of the protected characteristic," it may nevertheless deprive potential applicants of the right to advance "because of another reason … even if some characteristics of the individuals affected correlate perfectly with a protected category."  P&G Mot. at 15.   There is no disputing the first proposition; an employer would be no less liable for race discrimination under Section 1981 if it only refused to accept applications from Black job-seekers whose last names began with M-through-Z. *See United Auto. Workers v. Johnson Controls, Inc.*, 499 U.S. 187, 192, 200 (1991) (policy excluding "women . . . capable of bearing children" but not women "whose inability to bear children is medically documented" constituted unlawful sex-based discrimination); *see also Gorzynski v. JetBlue Airways Corp.*, 596 F.3d 93, 110 (2d Cir. 2010) (even if another subclass of protected employees were not subject to gender discrimination, plaintiff may have encountered sex-based discrimination); *Jefferies v. Harris Cty. Cmty. Action Ass'n*, 615 F.2d 1025, 1034 (5th Cir. 1980) (recognizing that it is "irrelevant" if black men or white

women were not subject to discrimination when plaintiff alleges discrimination against "black females," as a protected subgroup based on race and gender).

P&G is also plainly mistaken on the second proposition, that it may rely on a reason that otherwise "correlate[s] *perfectly* with a protected category." P&G Mot. at 15 (emphasis added). While a policy that excludes members of a protected class on some wholly unrelated basis might be permissible (e.g., a gender-neutral licensure requirement that happens to exclude only females in a small applicant pool), a proxy requirement that correlates closely with the protected characteristic never is (e.g., a requirement that workers not be capable of becoming pregnant). *Johnson Controls, Inc.*, 499 U.S. at 192. "[A] . . . policy that treats individuals differently on the basis of seemingly neutral criteria that are so closely associated with the disfavored group that discrimination on the basis of such criteria is, constructively, facial discrimination against the disfavored group." *Pac. Shores Prop., LLC v. City of Newport Beach*, 730 F.3d 1142, 1160 n.23 (9th Cir. 2013).

As P&G's Rule 30(b)(6) witness was forced to concede, its category of prohibited applicants has no U.S. citizens and is made up entirely of non-citizens. ASMF ¶ 66. Moreover, P&G's policy (permitting only citizens, Green Card holders, asylees and refugees) is not wholly unrelated, but rather is so closely connected with "alienage" that it cannot be logically separated. Thus, whether express or in practical effect, this is facial discrimination based against non-citizens.[14]

## IV.     P&G Has No "Same Decision" Defense.

P&G finally argues that summary judgment should be granted on its "same decision" defense, because (it contends) plaintiff would not have been hired anyway. The burden of proof on same-decision is on the defendant. *See, e.g.*, *Burton v. City of Belle Glade*, 178 F.3d 1175, 1189 (11th Cir. 1999); *Miles v. M.N.C. Corp.*, 750 F.2d 867, 875–76 (11th Cir. 1985).

---

[14]     P&G's reliance on *Mabra v. United Food & Commercial Workers Local Union No. 1996*, 176 F.3d 1357, 1357-58 (11th Cir. 1999) in support of its argument is misplaced. *Mabra* merely holds that the 1991 Civil Rights Act amendments to Title VII regarding defendants' mixed-motive/same-decision defense do not apply to Section 1981. Plaintiff addresses this issue in Section IV., *infra*. *Mabra* offers no support, however, for the argument that employers may facially discriminate against applicants or employees based on a proxy criterion that substantially or "perfectly" overlaps with the protected class. Indeed, such a rule would permit all manner of invidious discrimination and would defeat the purposes of Section 1981 and other anti-discrimination laws.

First, P&G has no same-decision defense at its disposal. In the years before *Gross v. FBL Fin. Serv's, Inc.*, 557 U.S. 167 (2009), and *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013), upended the law of causation, there was authority (albeit none controlling in this circuit) that allowed for such a defense under Section 1981. But *Gross* (reinforced by *Nassar*) swept away the ordinary application of the mixed-motive theory in employment discrimination cases, except where Congress expressly provided for a lesser-causation standard, such as "motivating factor" for status-based discrimination under Title VII, 42 U.S.C. §§ 2000e-2(m), 5(g)(2)(B). *See Gross*, 557 U.S. at 174, *Nassar*, 570 U.S. at 359–60.

In the aftermath of *Gross* and *Nassar*, some circuits (though not yet the Eleventh) have continued to recognize a mixed-motive theory under Section 1981. *See, e.g., Nat'l Assoc. of African American-Owned Media v. Charter Commc'ns*, 915 F.3d 617, 625–269 (9th Cir. 2019); *Brown v. J. Kaz, Inc.*, 581 F.3d 175, 182 n.5 (3d Cir. 2009). But this case presents no occasion to decide whether to follow that out-of-circuit authority, because the Eleventh Circuit's *controlling* decision in *Mora v. Jackson Mem'l Found., Inc.*, 597 F.3d 1201 (11th Cir. 2010), answers the question in the circumstances of this case. In *Mora*, an ADEA case, the court announced the converse side of the *Gross/Nassar* line of cases: where the plaintiff proves "but-for" liability, then there is no "same decision" defense because by the logic of "but-for" all other possible motivations are ruled out. *Id.* at 1204 ("[b]ecause an ADEA plaintiff must establish 'but for' causality, no 'same decision' affirmative defense can exist: the employer either acted 'because of' the plaintiff's age or it did not"). Here, the parties *agree* that P&G rejected Plaintiff's application because Plaintiff did not satisfy P&G's challenged hiring policy. P&G Mot. at 4 ("Rodriguez's online application, however, was rejected based on his answer to a question that asked whether he was a U.S. citizen, a permanent resident, refugee, or asylee"). P&G's policy is thus not only *a* but-for cause for P&G not hiring Plaintiff, it is *the* but-for cause, the only reason that has been given. There is no place under *Mora* for a same-decision defense under these facts.

Even if the defense could apply, it would fail as a matter of law. An employer may not prevail on "same decision" by offering a reason that did not motivate it *at the time of the adverse decision*. *See, e.g., Campbell v. Civil Air Patrol*, 138 Fed. App'x 201, 203 (11th Cir. 2005) ("[t]here is no evidence in the record that ... *at the time of the decision* to terminate Campbell, [defendants were] motivated to do so [for a legitimate reason]") (internal quotation marks omitted, emphasis added); *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1075 (11th Cir. 2003) ("[a]n employer

cannot prevail where the 'legitimate reason did not sufficiently motivate the employer at the time of the decision'") (quoting *Speedy v. Rexnord Corp.*, 243 F.3d 397, 402 (7th Cir. 2001)); *Burrell v. Bd. of Tr. of Ga. Military Coll.*, 125 F.3d 1390, 1395 (11th Cir. 1997) (same) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 250-53 (1989) (plurality opinion)).

Here, the adverse decision—rejecting Plaintiff—occurred at the first step of the application process. *See* P&G Mot. at 4 (Rodriguez's online application rejected based on citizenship question); *id.* at 11 ("applicants who did not fall into any of these categories … were rejected automatically"). P&G had no opportunity to consider Plaintiff's background because its system had *already* rejected him. It is therefore impossible for it to prove that any alleged absence of prior work/internship experience or leadership positions could have motivated its decision *at the time of* its adverse action. P&G cites in support only to *Adams v. Tuscaloosa City Bd. of Educ.*, No. 08 Civ. 1061, 2010 WL 11564929, at *12 (N.D. Ala. Mar. 11, 2010), but that case was decided strictly on pretext grounds, where plaintiff has the burden, and the citation to mixed-motives was dicta.

Finally, even if the same-decision defense were valid, the record manifests a genuine dispute of material fact. The employer must show not simply that it would have been justified in not hiring Plaintiff, but that it flatly would not have done so. *Speedy*, 243 F.3d at 402 ("proving that the same decision would have been justified absent a retaliatory motive is not the same as proving the same decision would have been made absent the motive"). P&G fails to offer any admissible evidence of any *objective standards* against which Plaintiff or the Court should measure Scott Isenhart's self-serving declaration. *See* CSMF ¶ 60; Isenhart Decl. ¶ 15, ECF No. 104-1 ("I have *now* reviewed Plaintiff David Rodriguez's application, which included his resume.") (emphasis added). P&G instead asks the Court to rely on Isenhart's *post hoc*, subjective judgment that he would not have granted Plaintiff an interview, which is scarcely enough to justify summary judgment on a defense where P&G has the burden of proof. *See, e.g.*, *Quigg v. Thomas Cty. Sch. Dist.*, 814 F.3d 1227, 1243 (11th Cir. 2016) (summary judgment reversed on same-decision defense where only evidence defendant "offers in direct support of this claim is self-serving [witness] testimony"); *Castleberg v. City of Dallas*, No. 09 Civ. 1354, 2011 WL 2559521, *5 (N.D. Tex. June 3, 2011) (denying summary judgment on "same decision" based on alleged "negative opinions of plaintiff held by police sergeants" on panel); *Scully v. Summers*, No. 95 Civ. 9091, 2000 WL 1234588, at *16 (S.D.N.Y. Aug. 30, 2000) (denying summary judgment where "evidence supporting [employer's] 'same decision' defense consists primarily of after-the-fact

statements by the panel members regarding their subjective evaluation of the candidates' interview performance"). P&G's failure to develop any record on this defense—which is unavailable to it in any event—does not come close to satisfying the standard for summary judgment.

**V.      Federal Immigration Law Does Not Immunize P&G from Liability.**

Having never once claimed that it was barred legally from hiring non-U.S. citizens like Plaintiff because of their immigration status, P&G cannot take harbor now in the fiction of complying with immigration law. P&G simply prefers to hire U.S. citizens because of its business model, which favors applicants whom, based on untested presumptions, it believes are a better cultural fit and likely remain with the company long-term. CSMF ¶ 9; ASMF ¶ 66. That P&G has this preference does not make it compliant with Section 1981, any more than Title VII tolerates automatically reassigning pregnant workers for safety reasons. *Everts v. Sushi Brokers LLC*, 247 F. Supp. 3d 1075, 1081 (D. Ariz. 2017) (categorical demotion of pregnant servers to lower-paying hostess job for safety reasons was facial discrimination).

P&G also suggests that its alleged compliance with the Immigration Reform and Control Act of 1986 ("IRCA") immunizes its classification decision from challenges under any other statute, citing only a 2010 Letter from Deputy Special Counsel, U.S. Department of Justice ("DOJ"), Civil Rights Division, Office of Special Counsel for Immigration-Related Unfair Employment Practices, Sept. 27, 2010. This assertion is wrong for several reasons. First, Section 1981 protects a broader class of non-citizens than IRCA, 8 U.S.C. § 1324b. P&G has not, and cannot now, argue that mere compliance with one law excuses the failure to follow a different, overlapping law. Second, the DOJ letter concerns a different issue (an employer's obligation to hire, and pay for, employees requiring visa sponsorship) than that presented here (P&G's blanket policy of refusing to consider *all non-citizens* other than Green Card holders, asylees and refugees, regardless of whether they require sponsorship). Third, the letter itself states in the first paragraph that the Deputy Special Counsel "cannot provide an advisory opinion on any set of facts involving a particular individual or entity." The letter is not a notice-and-comment regulation and warrants no deference here. *See Christensen v. Harris Cty.*, 529 U.S. 576, 587 (2000) ("[i]nterpretations such as those in opinion letters…do not warrant *Chevron*-style deference"). While opinion-letter guidance might be followed if persuasive, *id.*, the Office of Special Counsel for Immigration-Related Unfair Employment Practices offers no opinion about whether the same conduct would violate Section 1981 or any other statute that is not under the office's jurisdiction. *Cf. Epic Systems*

*Corp. v. Lewis*, 138 S. Ct. 1612, 1629 (2018) ("on no account might we agree that Congress implicitly delegated to an agency authority to address the meaning of a second statute it does not administer").

## CONCLUSION

For the above-stated reasons, summary judgment should be denied.

Dated: Miami, Florida
      June 7, 2019

Respectfully submitted,

**CIMO MAZER MARK PLLC**

*/s/ Jason S. Mazer*
Jason S. Mazer
Florida Bar No. 0149871
jmazer@cmmlawgroup.com
100 SE 2nd Street, Suite 3650
Miami, FL 33131-3650
Telephone: (305) 374-6484
Facsimile: (305) 374-6489

and

**OUTTEN & GOLDEN LLP**
Patrick David Lopez*
pdl@outtengolden.com
Sally J. Abrahamson*
sabrahamson@outtengolden.com
601 Massachusetts Avenue, Suite 200W
Washington, D.C. 20001
Telephone: (202) 847-4400
Facsimile (202) 847-4410

Ossai Miazad*
om@outtengolden.com
Michael Litrownik*
mlitrownik@outtengolden.com
Nina Martinez*
nmartinez@outtengolden.com
685 Third Avenue, 25th Floor
New York, New York 10017
Telephone: (212) 245-1000
Facsimile: (646) 509-2060

Paul Mollica*
161 North Clark Street, Suite 1600
Chicago, IL 60601

17

Telephone: (312) 809-7010

**THE MEXICAN AMERICAN LEGAL
DEFENSE AND EDUCATIONAL FUND**
Thomas A. Saenz*
tsaenz@MALDEF.org
634 S. Spring Street
11th Floor
Los Angeles, CA 90014
Telephone: (213) 629-2512
Facsimile: (210) 224-5382

Nina Perales*
nperales@MALDEF.org
110 Broadway, Suite 300
San Antonio, TX 78205
Telephone: (210) 224-5476
Facsimile: (210) 224-5382

Burth López*
blopez@maldef.org
1016 16th Street NW, Suite 100
Washington, DC 20036
Telephone: (202) 293-2828
Facsimile: (202) 293-2849

*Attorneys for the Plaintiff and Proposed Class*

*Admitted *Pro Hac Vice*

## **CERTIFICATE OF SERVICE**

I HEREBY certify that on June 7, 2019 I electronically filed the foregoing document with the Clerk of Court using CM/ECF.   I also certify that the foregoing document is being served this day on al counsel of record identified on the attached Service List in this manner specified, via transmission of Notice of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronic Notice Electronic Filing.

*/s/ Jason S. Mazer*