**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**Case No. 17-22652-CIV-WILLIAMS**

DAVID M. RODRIGUEZ,

      Plaintiff,

vs.

THE PROCTER & GAMBLE COMPANY,

      Defendant.

_____/

**ORDER**

      **THIS MATTER** is before the Court on Defendant Procter and Gamble's motion for summary judgment (DE 106).  Plaintiff filed a response in opposition (DE 116) and Defendant filed a reply (DE 119).  For the reasons discussed below, the motion (DE 106) is **DENIED**.

    **I.**     **FACTUAL BACKGROUND**

    **A.**  **Plaintiff David Rodriguez**

      In 1998, Plaintiff David Rodriguez ("Rodriguez"), a Venezuelan native, entered the United States on a tourist visa at age 14.  (DE 104-2 at 10-11.)  Rodriguez fled Venezuela to escape the increasing violence from the attempted coups led by Hugo Chavez.  (*Id.* at 9.)  His family, fearful of the political situation and concerned for his safety, had encouraged him to leave the country.  (*Id.*)  Upon arriving to the United States, Rodriguez lived with an aunt and cousin in Kendall, a neighborhood in Miami-Dade County, Florida.  (*Id.* at 11-12.)  Since then, Rodriguez has remained in South Florida and has never

returned to Venezuela; he considers himself as having "[grown] up here in the United States" and as being "from the United States."  (*Id.* at 15, 183.)

Plaintiff graduated from the magnet school, G. Holmes Braddock Senior High School in 2002, and for a few years before college, he worked in restaurants, tutored students, and took on "odd jobs."  (*Id.* at 41-43.)   In 2008, he enrolled at Florida International University ("FIU") as a part-time student.  (*Id.* at 45, 48.)  While earning his degree, he worked as a bartender and paid for his tuition with his earnings.  (*Id.* at 48-49, 227.)  At FIU, Rodriguez was a member of the Association of Latino Professionals for America and participated in community service through the United States Bartender Guild. (*Id.* at 63-64.)  His academic performance placed him on the University's Dean's List and he also won a scholarship essay award.  (*Id.* at 57.)  In Spring 2017, he graduated with a 3.96 GPA and received a Bachelor's degree in business administration with concentrations in finance and real-estate finance.  (*Id.* at 53, 56-58, 64.)  After college, Rodriguez was hired at a real-estate company as a leasing and marketing professional. (*Id.* at 103.)

In 2012, Rodriguez applied, and was approved for, the Deferred Action for Childhood Arrival ("DACA") program.  (*Id.* at 30-31.)  He also obtained an employment authorization document ("EAD"), which allowed him to work in the country legally.  (*Id.* at 31.)  Rodriguez has since renewed his DACA status and work authorization every two years.  (*Id.* at 32.)  In September 2013, several months after receiving work authorization, Rodriguez applied for a finance and accounting internship position at Procter and Gamble ("P&G" or "Company").  This case arises from Rodriguez's rejection from this position due

to P&G's policy that "applicants in the U.S. should be legally authorized to work with no restraints on the type, duration, or location of employment." (DE 105 at ¶ 55.)[1]

**B. P&G's Internship Program**

Procter and Gamble is a global business that manufactures and distributes a large variety of consumer products. (*Id.* at ¶ 1.)  Employees in the Company are organized by product categories (*e.g.*, oral care, feminine care, baby care) and function (*e.g.*, legal, human resources, sales, and IT). (*Id.* at ¶¶ 2-3.)  P&G employs over 90,000 employees worldwide, including over 20,000 in the United States. (*Id.* at ¶ 4.)  At the heart of this case is P&G's hiring policy for non-citizen applicants for its internship program. Specifically, Plaintiff challenges the Company's policy of automatically rejecting, at the first step of the application process, all non-U.S. citizen applicants, unless they are permanent residents, asylees, or refugees.  He asserts that the policy is discriminatory on the basis of alienage under 42 U.S.C. § 1981 ("Section 1981").

P&G's recruitment of interns and entry-level employees is guided by its "develop-from-within" hiring philosophy, which aims to hire candidates for long-term careers at the Company. (*Id.* at ¶¶ 6-7.)  While P&G internships last for only ten to twelve weeks (DE 117-1 at ¶ 73), the Company characterizes its intern hiring as more than just a short-term employment scenario. (DE 105 at ¶¶ 9, 10.)  Rather, through the internship program, P&G seeks to identify, and subsequently hire for full-time employment, those interns who have demonstrated the ability to succeed at the Company, and with the potential for long-term careers. (*Id.* at ¶ 10.)  P&G states that it invests substantial funds in the recruitment,

---

[1] The facts from the Parties' statements of material facts (DE 105, DE 117-1) are undisputed.

hiring, and training of interns and recruits at many universities, including those with large

immigrant populations, such as FIU.  (*Id.* at ¶¶ 11, 12-13.)

### C. The Hiring Process

The application process for P&G's internship program begins with an online

application, which includes a questionnaire about the applicant's background.  (*Id.* at ¶¶

14, 15.)   An applicant may be automatically rejected based on answers to specific

questions, including those regarding his or her immigration status, graduation year,

willingness to travel and relocate, and coursework.  (*Id.* at ¶¶ 16, 17.)  Applicants who are

not automatically rejected may proceed to the next phases of the hiring process, which

involve assessment tests, an initial interview, and a second interview.  (*Id.* at ¶¶ 19, 20,

23.)  P&G usually hires a very small percentage of intern applicants; generally 40,000

candidates apply each year, and only 300-500 are hired.  (*Id.* at ¶ 26.)

Since at least 2013, P&G has asked immigration-related questions in its online

application to automatically cull out certain non-citizen applicants.  (*Id.* at ¶ 29.)  In fiscal

year 2013 – 2014, when Plaintiff applied for an internship position, applicants were

required to answer the following questions:

- Are you currently a U.S. citizen OR national, OR an alien lawfully admitted for permanent residence, OR a refugee, OR an individual granted asylum, OR admitted for residence as an applicant under the 1986 immigration law?

  Please answer this question based on your current status only.  Do not answer based on a status for which you have applied, but have not been granted.

- Are you an individual who is now completing the permanent residency process but has not yet been granted permanent residency?

4

- Will you now, or in the future, require sponsorship for U.S.
  employment visa status (*e.g.* H1B or permanent residency
  status)?

(*Id.* at ¶ 30.)  Applicants who answered "NO" to the first question or "YES" to the second

or third questions were automatically rejected.  (*Id.* at ¶ 31.)  In fiscal years 2014-2015

and 2015-2016, the application included an additional immigration question: "Are you an

individual admitted exclusively on a nonimmigrant visa, such as a B, H, O, E, TN or L or

an individual on the F-1 visa completing CPT (Curricular Practical Training) or OPT

(Optional Practical Training)?"  (*Id.* at ¶ 32.)  Those who answered "YES" were

automatically rejected.  (*Id.* at ¶ 33.)  Starting in 2016, P&G ceased asking questions

regarding applicants' immigration status.  (*Id.* at ¶¶ 34-38.)  Instead, the only immigration-

related question posed to applicants was whether they required, or will require in the

future, U.S. employment visa sponsorship.[2]  (*Id.*)  Those who answered "YES" were

automatically rejected.  (*Id.*)

### D. <u>Plaintiff's Rejection from the P&G Internship Program</u>

In the summer of 2013, while Rodriguez was a student at FIU, he received a

newsletter with information about an on-campus presentation on internship opportunities

at P&G.  (*Id.* at ¶ 48.)  He attended the meeting, led by Eduardo Moreno, a FIU graduate

who worked for P&G, and Jose Nunez, a FIU student who had interned at the Company.

(*Id.* at ¶¶ 49-50.)  Rodriguez explained that as someone who was not born in the United

States, he felt welcomed by P&G at that presentation.  (DE 104-2 at 122-23.)  He recalled

that the presenters had explained that the Company did not offer work sponsorship, but

---

[2] Employers sponsoring a non-citizen employee's work visa, such as a H-1B visa, must petition
for that employee and pay a filing fee, which varies from $1,500 to $4,000, exclusive of attorney's
fees and costs.  *See* USCIS, Petition for a Nonimmigrant Worker, https://www.uscis.gov/forms/h-
and-l-filing-fees-form-i-129-petition-nonimmigrant-worker.

did not remember them making any other immigration-related comments.  (*Id.*)  After the presentation, Rodriguez kept in touch with Moreno, who answered his questions and gave him feedback on his resume.  (*Id.* at 130-131.)

In September 2013, Rodriguez applied for a finance and accounting internship at P&G.  (DE 105 at ¶ 52.)  While completing the online questionnaire, Rodriguez was asked whether he was a U.S. citizen, permanent resident, asylee, or refugee.  (*Id.* at ¶ 53.)  Rodriguez was automatically rejected from the internship, and barred from proceeding to subsequent stages of the application process, because he answered "NO."  (*Id.* at 54; DE 117-1 at ¶ 67.)  He received a formal rejection email on October 3, 2013.  (DE 117-1 at ¶ 69.)  On October 8, 2013, Rodriguez also received an email from P&G stating, "unfortunately, per P&G policy, applicants in the US should be legally authorized to work with no restraints on the type, duration, or location of employment."  (DE 105 at ¶ 55; DE 117-1 at ¶ 68.)

### E. The DACA Program

On June 15, 2012, Secretary of Homeland Security Janet Napolitano announced the DACA program in a memorandum entitled, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children."[3]  DACA grants certain immigrant children and young adults deferred action, a form of prosecutorial discretion where the Department of Homeland Security ("DHS") formally decides not to pursue removal of otherwise deportable non-citizens.  *See Regents of the Univ. of*

---

[3] *See* DHS, Memorandum from Secretary of Homeland Security Janet Napolitano, "Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children, (June 15, 2012), https://www.dhs.gov/xlibrary/assets/s1-exercising-prosecutorial-discretion-individuals-who-came-to-us-as-children.pdf ("Napolitano Memorandum").

*California v. U.S. Dep't of Homeland Sec.*, 908 F.3d 476, 490 (9th Cir. 2018).  Secretary Napolitano explained that the nation's immigration laws were not designed "to remove productive young people to countries where they may not have lived or even speak the language," especially because "many of these young people have already contributed to our country in significant ways," and "lacked the intent to violate the law."  Napolitano Memorandum.  President Obama also announced that the purpose of DACA is to stop expelling "talented young people," who have "been raised as Americans; understand themselves to be part of this country," and "who want to staff our labs, or start new businesses, or defend our country."[4]

To be considered for DACA, applicants must satisfy the requirements set forth in the Napolitano Memorandum.  Specifically, the applicant must:

1. Have entered the United States under the age of 16;

2. Have continuously resided in the United States since June 15, 2007;

3. Be currently enrolled in school, have graduated from high school, have obtained a general education development certificate, or have been honorably discharged from the U.S. Coast Guard or Armed Forces;

4. Have not been convicted of a felony offense, a significant misdemeanor offense, multiple misdemeanor offenses, or are

---

[4] President Barack Obama, Remarks by the President on Immigration (June 15, 2012), https://obamawhitehouse.archives.gov/the-press-office/2012/06/15/remarks-president-immigration.  Respondents in the pending Supreme Court case considering the lawfulness of the DACA rescission filed a supplemental brief highlighting "DACA recipients' impact on the economy and the importance of their participation in public health measures," especially during the coronavirus pandemic.  Respondent's Supplemental Brief, *Chad Wolf v. Martin Jonathan Batalla Vidal*, No. 18-589, 2 (Apr. 20, 2020).  They explained that "[a]pproximately 27,000 DACA recipients are healthcare workers—including nurses, dentists, pharmacists, physician assistants, home health aides, technicians, and other staff—and nearly 200 are medical students, residents, and physicians."  *Id.*

otherwise not a threat to national security or public safety[5]; and

5. Have been under the age of 30 as of June 5, 2012

*See* Napolitano Memorandum at 1.

Those who meet these criteria are not automatically eligible for deferred action. *See Regents*, 908 F.3d at 490.  Rather, the decision to grant DACA is made on case-by-case basis, after applicants have completed rigorous biographical and biometric background checks.  *Id.*  If approved, the recipient is granted a renewable two-year term of deferred action, which allows him or her to apply for temporary work authorization (an EAD) under pre-existing DHS regulations.  *See* 8 C.F.R. Section 274a.12(c)(14) (providing that "an alien who has been granted deferred action" is eligible for work authorization upon a showing of "economic necessity for employment.").  "Indeed, DACA recipients are *required* to apply for employment authorization, in keeping with the Executive's intention that DACA recipients remain 'productive' members of society." *Regents*, 908 F.3d at 490 (quoting *Ariz. Dream Act Coal v. Brewer*, 757 F.3d 1053, 1062 (9th Cir. 2014)).  DACA recipients in possession of an EAD are legally authorized to work in the United States.

On September 5, 2017, Acting DHS Secretary Elaine Duke issued a memorandum rescinding DACA.[6]  In response, several lawsuits were filed challenging the memorandum, which are now pending before the Supreme Court in the consolidated

---

[5] Rodriguez has never been arrested or convicted of any crime. (DE 104-2 at 25.)

[6] *See* Duke Memo, "Rescission of the June 15, 2012 Memorandum Entitled 'Exercising Prosecutorial Discretion with Respect to Individuals Who Came to the United States as Children'" (Sept. 5, 2017), https://www.dhs.gov/news/2017/09/05/memorandum-rescission-daca ("Duke Memorandum").

case, *Department of Homeland Security v. Regents of the University of California*, 139 S. Ct. 2779, 204 L. Ed. 2d 1156 (2019).[7]  In early 2018, federal courts ordered nationwide preliminary injunctions suspending the implementation of certain aspects of the Duke Memorandum pending a ruling on the merits.  *See Regents of Univ. of California v. United States Dep't of Homeland Sec.*, 279 F. Supp. 3d 1011 (N.D. Cal. 2018); *Batalla Vidal v. Nielsen*, 279 F. Supp. 3d 401 (E.D.N.Y. 2018).  The injunctions require DHS to continue processing renewal applications on a case-by-case basis, but do not require the consideration of new initial applications.[8]

### F.  Procedural History

In July 2017, Plaintiff filed a putative class action complaint on behalf of DACA recipients, and other non-citizens who possess legal work authorization in the United States, who were automatically rejected for a position at P&G.[9]  (*See* DE 1.)  The

---

[7] The Court anticipates that the Supreme Court will issue a decision in *Regents* in the coming days.  During oral argument, when asked if it was appropriate for the Court to rule on Defendant's motion pending a decision in *Regents*, neither party expressed opposition to this Court adjudicating the issues here, which are distinct from those presented in *Regents*.

[8]  The Court takes judicial notice of the data and reporting on DACA recipients.  *See Shahar v. Bowers*, 120 F.3d 211, 214 (11th Cir. 1997).  As of July 31, 2018, there are 703,890 active DACA recipients in the country.  *See* USCIS, Active DACA Recipients as of July 31, 2018, https://www.uscis.gov/sites/default/files/USCIS/Resources/Reports%20and%20Studies/Immigra tion%20Forms%20Data/All%20Form%20Types/DACA/DACA_Population_Data_July_31_2018. pdf.  DACA recipients have become vital employees in industries across the economy, with tens of thousands working in education, health, social services, food, hospitality, and more.  *See* Jie Zong, *et al.*, A Profile of Current DACA Recipients by Education, Industry, and Occupation, https://www.migrationpolicy.org/sites/default/files/publications/DACA-Recipients-Work-Education-Nov2017-FS-FINAL.pdf.

[9] Plaintiff's motion for class certification is still pending. (*See* DE 85.)  District courts usually rule on class certification motions before deciding summary judgment motions.  Federal Rule of Civil Procedure 23(c) provides that the court should decide class certification at "an early practicable time."  However, a defendant may choose to move for summary judgment before the district court decides whether the case should proceed as a class action.  In this scenario, the district court has discretion to rule on the motion for summary judgment before deciding the class certification motion.  *See Telfair v. First Union Mortg. Corp.*, 216 F.3d 1333, 1343 (11th Cir. 2000) ("It was

complaint contends that P&G's recruitment practice of categorically excluding all work-authorized non-citizens, except those who are a permanent resident, refugee, or asylee, is facially discriminatory on the basis of alienage in violation of Section 1981.[10]   This matter is now before the Court on Defendant's motion for summary judgment.

1. **Defendant's Motion for Summary Judgment**

P&G has moved for summary judgment against Plaintiff Rodriguez's individual claims on several grounds.  First, relying on *Estrada v. Becker*, 917 F.3d 1298 (11th Cir. 2019), P&G argues that Rodriguez cannot prevail in his claim because DACA recipients are not entitled to Section 1981's protections against alienage discrimination.  Second, P&G argues that even if DACA recipients are protected under Section 1981, Plaintiff would still be unable to prevail in his claim because P&G did not classify applicants on the basis of "alienage"—or lack of U.S. citizenship—but based on their "immigration status."  Defendant explains that it "routinely hire[s]" refugees, parolees, and asylees—all of whom are non-citizens.  (DE 106 at 5.)  The Company concedes that it automatically rejected DACA recipients, but explains that such exclusion is based on "immigration status," which it argues is "not synonymous" with alienage discrimination.  (*Id.* at 12.) P&G explains that DACA recipients are excluded not because they lack U.S. citizenship, but because their deferred action status does not grant them a right to work in the United

---

within the court's discretion to consider the merits of the claims before their amenability to class certification."); *Cowen v. Bank United of Texas*, 70 F.3d 937, 941 (7th Cir. 1995) ("The bank elected to move for summary judgment before the district judge decided whether to certify the suit as a class action.  This is a recognized tactic . . . and does not seem to us improper.") (citation omitted).

[10]  An amended complaint was filed for the sole purpose of including an additional plaintiff as class representative, Marat Papazian. (*See* DE 72.)  However, Papazian has been withdrawn as a plaintiff.  (*See* DE 84.)

States permanently.   Accordingly, hiring these applicants is incompatible with P&G's "develop from within" hiring model, which aims to hire candidates for long-term careers.

P&G next argues that the Equal Protection Clause analysis in *Estrada* supports a finding that the exclusion of DACA recipients does not violate Section 1981.  In *Estrada*, the Eleventh Circuit held that a Georgia Board of Regents' policy that excluded DACA recipients from attending Georgia's three most selective public universities did not violate the Equal Protection Clause.  The court concluded that DACA recipients did not belong to a "suspect class" under the Fourteenth Amendment.  *See Estrada*, 917 F.3d at 1308-1309.  Therefore, their exclusion would be evaluated under rational basis review, which, the court found, "the Policy easily survives."  *Id.* at 1310.   P&G contends that courts "should look to interpretations of the Equal Protection Clause to determine whether a classification under Section 1981 is facially discriminatory."  (DE 106 at 13.)  Relying on the Equal Protection analysis in *Estrada*, Defendant argues that P&G's exclusion of DACA recipients is "not an improper classification under Section 1981."  (*Id.* at 15.)

Finally, P&G maintains that even if Plaintiff could establish that its exclusion of DACA recipients is facially discriminatory on the basis of alienage, it could not be held liable under Section 1981 because it is entitled to rely on the "same-decision" defense. P&G explains that Rodriguez would not have been hired for an internship regardless of his DACA status because he lacked the requisite work, internship, and leadership experiences.

### 2. **Plaintiff's Response in Opposition**

Plaintiff has responded to each of Defendant's arguments.  First, Rodriguez argues that the cases P&G has cited for its assertion that Section 1981 does not protect DACA

recipients are inapposite, because they had no "occasion to decide whether a non-citizen who is *legally authorized* to work in the United States," may, under Section 1981, "suffer private employment discrimination owing to alienage."  (DE 116 at 9.)  Next, Plaintiff argues that P&G's hiring policy is facially discriminatory on the basis of alienage because it broadly screened out *all* non-citizens, unless the applicant fell within one of the exceptions; under the policy, all U.S. citizens were "in," and all non-citizens were "out," unless expressly exempted.  (*Id.* at 11.)

Plaintiff further explains that the Equal Protection analysis in *Estrada* is not binding on this case, which involves a private-sector Section 1981 claim, because the Eleventh Circuit had no occasion to consider the scope of the statute at issue here.  Rodriguez further argues that there are important doctrinal differences between the Equal Protection Clause and Section 1981, such that the outcome of an Equal Protection challenge would not dictate the outcome of a Section 1981 case.  For example, unlike Equal Protection challenges, in Section 1981 cases, there is no "rational basis" defense that could justify a facially discriminatory policy.  As such, "the public policy justifications available to state governments under the Fourteenth Amendment are [ ] not applicable to discrimination carried out by private parties under Section 1981."  (*Id.* at 6.)

Finally, Plaintiff argues that P&G is not entitled to summary judgment under the "same decision" defense because an employer may not offer a non-discriminatory justification that did not exist at the time the adverse decision was made.  Rodriguez explains that because he was automatically rejected at the first step of the application by the online questionnaire, P&G had no opportunity to consider his candidacy on any other grounds.

## II.   **LEGAL STANDARD**

### A.  **Section 1981**

Section 1981(a) provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts . . . as is enjoyed by white citizens. . . ."  Section 1981 prohibits intentional race and alienage discrimination "in the making and enforcement of public and private contracts, including employment contracts."  *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999); *Duane v. GEICO*, 37 F.3d 1036, 1043 (4th Cir. 1994) ("under the plain language of the provision, 'all persons,' blacks and aliens, receive the same protection against discrimination.").  "Section 1981 liability must be founded on purposeful discrimination."  *Ferrill*, 168 F. 3d at 472.  Thus, "only direct or inferential modes of proving intentional discrimination are available to the § 1981 plaintiff."  *Id.*  "The test for intentional discrimination in suits under § 1981 is the same as the formulation used in Title VII discriminatory treatment cases."  *Id.*  To establish a Section 1981 violation, the plaintiff must establish: (1) that he or she is a member of a protected class, (2) the defendant intentionally discriminated against him or her on the basis of membership in that protected class; and (3) the discrimination concerned one of Section 1981's enumerated activities. *See Jackson v. BellSouth Telecommunications*, 372 F. 3d 1250, 1270 (11th Cir. 2004).

### B.  **Summary Judgment**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  Under this standard, "[o]nly disputes over facts that might affect the outcome of the suit under the governing [substantive] law will properly preclude the

entry of summary judgment." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). And any such dispute is "genuine" only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* "It is appropriate for the Court to resolve [ ] purely legal questions" at the summary judgment stage. *Statewide Detective Agency, Inc. v. Miller*, 1998 WL 1785456, at *1 (N.D. Ga. Aug. 12, 1998).

III. **DISCUSSION**

This case calls on the Court to consider whether an employer may categorically decline to hire DACA recipients for a 10 to 12-week internship program. For DACA recipients—many of whom were brought to this country by their parents as minor children or, as in Rodriguez's situation, entered unaccompanied after fleeing violence in their home countries—their status in this country is a "legal characteristic over which [they] can have little control." *Plyler v. Doe*, 457 U.S. 202, 220 (1982). Moreover, because DACA recipients possess EADs, they are indisputably lawfully authorized to work and eligible to compete for private employment. In fact, they are required to obtain an EAD, "in keeping with the Executive's intention that DACA recipients remain 'productive' members of society." *Regents*, 908 F.3d at 490 (citation omitted).

It is against this backdrop that the Court considers the Parties' positions. The Parties do not dispute that when Rodriguez applied for an internship in 2013, P&G maintained a policy that automatically rejected, at the first step of the application process, all non-citizen applications, except permanent residents, asylees, and refugees.[11] Nor

---

[11] Defendant's motion addresses P&G's rejection of Rodriguez by using the first question of the 2013-2014 questionnaire: "[a]re you currently a U.S. citizen OR national, OR an alien lawfully admitted for permanent residence, OR a refugee, OR an individual granted asylum, OR admitted for residence as an applicant under the 1986 immigration law?" To resolve Defendant's motion, the Court limits its consideration to P&G's use of this question and need not consider P&G's hiring policy of non-citizens in subsequent years.

do they contest that Rodriguez, a DACA recipient, was rejected because of this policy. The Parties, however, disagree on its legal implication—specifically, whether it constitutes unlawful alienage discrimination under Section 1981.  Defendant has asserted three legal arguments as to why its hiring policy does not violate Section 1981, each capable of resolution by referencing the Parties' undisputed facts.  First, P&G argues that DACA recipients do not belong to a protected group under Section 1981, an essential element of a Section 1981 claim.  Second, P&G claims that its policy of rejecting DACA recipients is not facially discriminatory on the basis of "alienage," but "immigration status," and therefore does not violate Section 1981.  Third, Defendant contends that a finding that its policy is lawful under Section 1981 is supported by the Eleventh Circuit's Equal Protection analysis in *Estrada.*  In addition to these purely legal arguments, P&G has also asserted an argument that raises a factual question, contending that even if its policy discriminates based on alienage, it is not liable under the "same-decision" defense.  The Court has considered Defendant's arguments and, for the reasons discussed below, finds each to be unpersuasive.  Accordingly, P&G's motion for summary judgment is denied.

## A. Section 1981's Protection Against Employer Alienage Discrimination Extends to DACA Recipients

P&G claims that Plaintiff, a DACA recipient, is not entitled to the protections of Section 1981, arguing that "[o]nly aliens who are lawfully present in the country under the immigration laws adopted by Congress are covered by the anti-discrimination protections enacted under the Fourteenth Amendment, including Section 1981."  (DE 106 at 7.)

It is well-settled that Section 1981's protection against employer alienage discrimination extends to lawfully present immigrants.  *See Torao Takahashi v. Fish & Game Comm'n*, 334 U.S. 410 (1948); *Wright v. Southland Corp.*, 187 F.3d 1287, 1297

15

n.12 (11th Cir. 1999).  Several cases have held that Section 1981 protects DACA recipients, relying on the assumption that they are lawfully present in the United States. *See, e.g.*, *Juarez v. Nw. Mut. Life Ins. Co.*, 69 F. Supp. 3d 364, 369 (S.D.N.Y. 2014) ("Section 1981's protection against discrimination extends to all lawfully present aliens, whether or not they have a green card. . . ."); *Pena v. Wells Fargo Bank*, *N.A.*, 2019 WL 7050148, at *2 (N.D. Cal. Dec. 23, 2019) ("aliens protected by Section 1981 are aliens who are lawfully present in the country . . . DACA recipients are considered to be lawfully in the country. . . .").  However, courts have had no occasion to consider whether Section 1981's protections extend to non-citizens who possess legal work authorization, but who were not "lawfully admitted."  Because the text and legislative history of Section 1981 confirm that the statute's protection against employer alienage discrimination applies to all work-authorized immigrants, and that Congress did not express a clear intent to exclude subclasses of immigrants from its protection, the Court concludes that DACA recipients are not excluded from Section 1981's protections.  *See Comcast Corp. v. Nat'l Ass'n of African Am.-Owned Media*, 140 S. Ct. 1009, 1013 (2020) (observing "this particular statute's text and history" when interpreting Section 1981).

1.    **The Language of Section 1981**

In analyzing whether Section 1981's protection against alienage discrimination extends to DACA recipients, the Court starts with the statutory text.  *See Graham Cty. Soil & Water Conservation Dist. v. U.S. ex rel. Wilson*, 559 U.S. 280 (2010); *Shotz v. City of Plantation, Fla.*, 344 F.3d 1161 (11th Cir. 2003).  In construing a statute, "the preeminent canon of statutory interpretation requires us to presume that the legislature says in a statute what it means."  *Am. Bankers Ins. Grp. v. United States*, 408 F.3d 1328,

1332 (11th Cir. 2005) (citation and brackets omitted).  Section 1981 provides, in relevant part, "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts. . . as is enjoyed by white citizens . . . ."  42 U.S.C. Section 1981.  The plain text of Section 1981 makes clear that the scope of its protection extends to "all persons within the jurisdiction of the United States."[12] While P&G maintains that DACA recipients are excluded from its coverage, this interpretation finds no support from the statutory text.  There are no express exceptions in Section 1981, or any other statutory language, to suggest that Congress intended to exclude subclasses of immigrants from its protection.  *See Runyon v. McCrary*, 427 U.S. 160, 206 (1976) (White, J., Dissenting) ("The statute draws no such distinction among classes of persons. . . ."); *Anderson v. Conboy*, 156 F.3d 167, 180 (2d Cir. 1998) ("IRCA expressly exempts 'illegal' aliens from coverage whereas Section 1981 does not. . . .").  Indeed, P&G has failed to identify any statutory language to support its reading.  Because courts may not "read an exception into a statutory provision where it does not exist," the clear text of Section 1981 confirms that DACA recipients are protected under the statute. *United States v. Flute*, 929 F.3d 584, 589 (8th Cir. 2019); *Guidry v. Sheet Metal Workers Nat. Pension Fund*, 493 U.S. 365, 376 (1990) ("courts should be loath to announce [ ] exceptions to legislative requirements or prohibitions that are unqualified by the statutory text.").

---

[12] It should be noted that the Court is not finding that Section 1981 protects undocumented immigrants who lack any lawful work authorization.  The Court is aware that this reading would require employers to give individuals with no legal right to work the "same right" to "make and enforce" employment-related contracts as work-authorized citizens.  As such, this interpretation would contradict another statutory scheme, the requirements of Immigration Reform and Control Act ("IRCA"), 8 U.S.C. § 1324a(1)(A), which prohibits employers from hiring immigrants who are not work-authorized.

A finding that DACA recipients are "persons" protected under Section 1981 is also supported by the Supreme Court's interpretation of the scope of "persons" protected under the Equal Protection Clause.   Section 1981's protection against alienage discrimination derives from Section 16 of the Voting Rights Act of 1870 ("Section 16"), a provision enacted two years after the passage of the Equal Protection Clause.   *See Anderson*, 156 F.3d at 172.   The language in Section 16 draws significantly from the Equal Protection Clause, which states "nor shall any state . . . deny to any *person within its jurisdiction* the equal protection of the laws." (emphasis added).   Section 16 contains strikingly similar language and provides, "[a]ll *persons within the jurisdiction* of the United States shall have the same right in every State and Territory in the United States to make and enforce contracts. . . as is enjoyed by white citizens. . . ."   *See Runyon*, 427 U.S. at 197 n.6 (emphasis added).   Section 1981 adopted this exact language from Section 16.

Because the term "persons" in Section 1981 derives directly from the Equal Protection Clause, interpretations of "persons" under the Equal Protection Clause is instructive for construing the scope of "persons" protected under Section 1981.   *See Anderson*, 156 F.3d at 172 ("The use of 'persons' . . . reflects the language of that newly enacted Amendment.").   The Supreme Court has made clear that all immigrants in the United States are "persons" protected under the Equal Protection Clause.   *See Plyler v. Doe*, 457 U.S. 202, 210 (1982) ("[w]hatever his status under the immigration laws, an alien is surely a 'person' in any ordinary sense of that term.   Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").   Thus, *Plyler* further persuades the Court that DACA recipients are "persons" protected under Section 1981.

2.    **Legislative History**

But to the extent the text of Section 1981 is ambiguous, its legislative history also supports a finding that all work-authorized immigrants are protected.[13]  The legislative history demonstrates that the drafters of Section 16—the provision from which Section 1981's protection against alienage discrimination is derived—intended its scope to extend broadly to all immigrants in the country and expressed no intent to exclude subclasses from its coverage.

Section 1981 derives from two sources of law, Section 1 of the Civil Rights Act of 1866 and Section 16 of the Voting Rights Act of 1870.  *See Anderson*, 156 F.3d at 172. "Because Section 1 of the 1866 Act was addressed only to race discrimination," Section 1981's "prohibition against alienage discrimination must be derived from Section 16 of the 1870 Act."  *Id.* at 173.  Section 16 was passed pursuant to the Fourteenth Amendment. *Id.*  Legislative history shows that Section 16's immediate purpose was to protect Chinese immigrants from state laws that "restrict[ed] their ability to work," and "otherwise discourag[ed] them from immigrating to and living in California."  *Id.*  Senator Stewart, the sponsor of S. 365—the bill that would later become Sections 16 through 18 of the Voting Rights Act—explained that the bill was intended to extend the rights of the Equal Protection Clause to Chinese immigrants.[14]  *Id.*  While the "plight of the Chinese aliens"

---

[13] "The Supreme Court has consistently interpreted both Sections 1981 and 1982 with reference to legislative history."  *Hicks v. Brown Grp., Inc.*, 902 F.2d 630, 643 n.31 (8th Cir. 1990), *cert. granted*, *judgment vacated*, 499 U.S. 914 (1991) (citing cases).

[14] Senator Stewart explained, with reference to the portion of the bill that would become Section 16, "[w]hile [the Chinese immigrants] are here I say it is our duty to protect them. . . . It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see that they have the equal protection of the laws, notwithstanding that they are aliens." *Anderson*, 156 F.3d at 174 (quoting Cong. Globe, 41st Cong., 2d Sess. 1536 (1870)).

was foremost in Senator Stewart's thinking, the legislative record demonstrates "that Congress intended to extend Section 16's protections to groups other than the Chinese" and to "apply to all aliens." *Id.*; *De Malherbe v. Int'l Union of Elevator Constructors*, 438 F. Supp. 1121, 1140 (N.D. Cal. 1977) ("Congress passed the 1870 Act for the protection of aliens under its power to enforce the Fourteenth Amendment.").

The legislative record is replete with remarks demonstrating that Section 16 was intended to protect all non-citizens in the United States from alienage discrimination. Missing from these records are statements indicating the intent of the drafters to exclude subclasses of immigrants from its protection. For instance, Senator Stewart explained:

> The original civil rights bill protected all persons born in the United States in the equal protection of the laws. This bill extends it to aliens, so that **all persons who are in the United States shall have the equal protection of our laws**. It extends the operation of the civil rights bill which is well known in the Senate and to the country, **to all persons within the jurisdiction of the United States.**

Cong. Globe, 41st Cong., 2d Sess. 1536 (1870) (emphasis added.) He further stated:

> It is as solemn a duty as can be devolved upon this Congress to see that those people are protected, to see that they have the equal protection of the laws, notwithstanding that they are aliens. **They, or any other aliens, who may come here are entitled to that protection.**

*Id.* at 3658 (1870) (emphasis added). Accordingly, "[t]hese statements indicate that, whatever the initial motivation behind the legislation, Section 16 was to apply to all aliens." *Anderson*, 156 F.3d at 174.

Moreover, the structure of the 1870 Act confirms that Section 16 was not intended to exclude subclasses of immigrants from its protection. Section 17 of the 1870 Act, also derived from S. 365, provided for criminal sanctions for any person, who under color of

20

law, subjected "*any inhabitant of any State or Territory* to the deprivation of any right secured or protected by the last preceding section of this act, or to different punishment, pains, or penalties *on account of such person being an alien*, or by reason of his color or race, than is prescribed by the punishment of citizens."  *Id.*  (emphasis added).  Section 17 is a criminal statute that "was part of the same bill as Section 16," and "by its plain language enforced the specific rights enumerated in Section 16."  *Id.* In enforcing the rights established by Section 16, Section 17 extended its protection to "any inhabitant of any State or Territory" without limitation; by its plain text, Section 17's protection extended to all immigrants in the country.[15]

For these reasons, the language and legislative history of Section 1981 persuade the Court that its protection against employer alienage discrimination extends to all work-authorized immigrants.  Accordingly, based on the specific issues and facts of this case, the Court concludes that DACA recipients are protected from intentional employer discrimination under Section 1981.

### 3.    **P&G's Cases are Distinguishable**

P&G cites to a number of cases to supports its assertion that "Section 1981 does not protect aliens who are not lawfully present in the United States."  (DE 106 at 7.)  These

---

[15] The Court further notes that Congress amended Section 1981 in 1991 by "redesignating the existing text as Section 1981(a) and by adding subsections (b) and (c)."  *Anderson*, 156 F.3d at 178.  Subsection (b) expanded Section 1981's protection to "make and enforce contracts" to "all phases and incidents of the contractual relationship."  *Comcast*, 140 S. Ct. at 1020 (Ginsburg, J., concurring) (citation omitted).  Subsection (c) "confirms Section 1981's coverage of both public and private sector employment."  *Anderson*, 156 F.3d at 179 (citation omitted).  Prior to the 1991 amendment, courts had interpreted Section 1981 as protecting against alienage discrimination, and some courts had expressed concerns with extending this protection to "unlawfully present" immigrants.  *See Bhandari v. First Nat. Bank of Commerce*, 829 F.2d 1343, 1351 (5th Cir. 1987) (expressing skepticism that Section 1981 "protect[s] all aliens, legal and *illegal*, from employment discrimination.").  While Congress had the opportunity to amend Section 1981(a) to limit its protection to "lawfully present" immigrants, it did not do so.

cases had no occasion to consider whether any subclass of legally work-authorized immigrants is excluded from Section 1981's protection.  Accordingly, they do not inform the discussion of whether Section 1981 protects DACA recipients.

Defendant cites to the Supreme Court case *Torao Takahashi v. Fish and Game Commission*, a constitutional challenge to a California law that banned "any person ineligible to citizenship" under federal immigration laws from obtaining a commercial fishing license.  *Takahashi*, 334 U.S. at 413.  At the time, federal laws allowed Japanese immigrants to lawfully enter and reside in the country, but made them ineligible for citizenship.  The plaintiff, a lawfully present Japanese immigrant, sued the state after he had lost the ability to earn a living as a commercial fisherman. The Supreme Court invalidated the law, finding that it was unconstitutional under the principles of the Equal Protection Clause and preemption doctrine.  *See Anderson*, 156 F.3d at 177 ("Although the Court struck down the law, the basis for the decision was unclear, appearing to rely on both the Equal Protection Clause of the Fourteenth Amendment and Congress's exclusive power under Article I to control immigration.").

P&G cites to a portion of the opinion in which the Court referenced Section 1981, and explained "[t]he Fourteenth Amendment and the laws adopted under its authority thus embody a general policy that *all persons lawfully* in this country shall abide 'in any state' on an equality of legal privileges with all citizens under non-discriminatory laws." *Takahashi*, 334 U.S. at 420 (emphasis added).  P&G contends that this pronouncement "[makes] clear that the protection of this law did not extend to aliens not lawfully present in the country."  (DE 106 at 7.)  The Court finds P&G's reading of *Takahashi* to be unpersuasive.  First, nowhere in the opinion did the Court declare that subclasses of

immigrants were excluded from the protections of the Fourteenth Amendment and the laws adopted under its authority. Second, even if the Court had made such a pronouncement, it would be dicta—and therefore not binding on the Court—and abrogated by more recent cases that have held the opposite. *See Plyler*, 457 U.S. at 210 ("Aliens, even aliens whose presence in this country is unlawful, have long been recognized as 'persons' guaranteed due process of law by the Fifth and Fourteenth Amendments.").

P&G also cites to *Anderson v. Conboy*, a case that considered whether Section 1981 prohibits alienage discrimination by private employers. The plaintiff in *Anderson* was an immigrant from Jamaica who was elected as a business representative for a local chapter of a trade union, but was later removed from the role because the trade union prohibited service unless "such member is a citizen of the United States or Canada." *Anderson*, 156 F.3d at 168. Plaintiff initiated a Section 1981 lawsuit for private alienage discrimination. After reviewing Section 1981's language, history, and structure, the court reversed the district court's dismissal of the plaintiff's claim, holding that Section 1981 protects non-citizens from private alienage discrimination.

The employer argued that extending Section 1981's prohibition of alienage discrimination to private employers would conflict with IRCA, which "imposes sanctions against employers who knowingly hire or continue to employ aliens not authorized to work in the United States." *Id.* at 180. It claimed that because Section 1981 did not expressly exempt "illegal aliens" from coverage, "applying Section 1981 to claims of private alienage discrimination would lead to the absurd result of holding liable under Section 1981 employers who refuse to hire undocumented aliens in order to comply with IRCA." *Id.*

The court rejected this argument explaining, "[i]f an employer refuses to hire a person because that person is in the country illegally, that employer is discriminating on the basis not of alienage but of noncompliance with federal law." *Id.* P&G quotes to this portion of *Anderson* to claim that the court "emphasized . . . that Section 1981 does not protect aliens who are not lawfully admitted." (DE 106 at 8.)

P&G's misses the mark by reading this quote as implying a categorical exclusion of DACA recipients, who are required to possess work authorization, from Section 1981's protections. In addressing the employer's concern about conflict with IRCA, the court considered whether a private employer's compliance with IRCA, by refusing to hire immigrants lacking legal work authorization, constitutes prohibited alienage discrimination under Section 1981. While the court concluded that rejection of these applicants would not violate Section 1981, it did not consider the separate question of whether a private employer may discriminate against subclasses of work-authorized non-citizens. Indeed, this hypothetical was not before the Court because hiring DACA recipients, and other work-authorized immigrants, does not violate IRCA and therefore would not create the statutory conflict of concern in *Anderson*.[16] *See supra* n.12.

For these reasons, the Court finds *Takahashi* and *Anderson* to be distinguishable; they do not preclude the Court from holding that Section 1981 protects DACA recipients.

## B. P&G's Policy is Facially Discriminatory on the Basis of Alienage

---

[16] P&G also cites to *Juarez*, 69 F. Supp. 3d at 369. But as Defendant acknowledges, *Juarez* explained that it "need not address the extent, if any, to which § 1981's protection against discrimination extends to illegal or undocumented immigrants." *Juarez*, 69 F. Supp. 3d at 369 n.7.

P&G's next argues that its policy does not violate Section 1981, contending that it did not classify on the basis of "alienage," but by "immigration status."  To establish a violation of Section 1981 for alienage discrimination, a plaintiff must prove that he was intentionally discriminated against because he lacked U.S. citizenship. *See Jackson v. BellSouth Telecommunications*, 372 F.3d 1250, 1270 (11th Cir. 2004); *Ferrill v. Parker Grp., Inc.*, 168 F.3d 468, 472 (11th Cir. 1999).  Intentional discrimination can be established by a facially discriminatory policy: one that explicitly applies less favorably to some, or all, members of a protected group.  *See Int'l Union, United Auto., Aerospace & Agr. Implement Workers of Am., UAW v. Johnson Controls, Inc.*, 499 U.S. 187, 198 (1991) (the "policy is facially discriminatory because it requires only a female employee to produce proof that she is not capable of reproducing."); *Cmty. House, Inc. v. City of Boise*, 490 F.3d 1041, 1048 (9th Cir. 2007) ("A facially discriminatory policy is one which on its face applies less favorably to a protected group."); *Bangerter v. Orem City Corp.*, 46 F.3d 1491, 1500 (10th Cir. 1995) (the policy "facially single[s] out the handicapped and appl[ies] different rules to them.  Thus, the discriminatory intent and purpose of the [policy] are apparent on [its] face.").  The Supreme Court has announced that a policy is facially discriminatory if it cannot survive the "but-for" test; that is, if "the evidence shows 'treatment of a person in a manner which but for that person's [protected characteristic] would be different.'" *Johnson Controls*, 499 U.S. at 200 (citing *City of Los Angeles, Dep't of Water & Power v. Manhart*, 435 U.S. 702, 711, 98 S. Ct. 1370, 1377, 55 L. Ed. 2d 657 (1978)).  A facially discriminatory policy is dispositive evidence of intentional discrimination.  "Where a claim of discriminatory treatment is based upon a policy which on its face applies less favorably" to members of a protected class, "a plaintiff need not

otherwise establish the presence of discriminatory intent" with other evidence.  *Frank v. United Airlines, Inc.*, 216 F.3d 845, 854 (9th Cir. 2000) (internal citations and brackets omitted).

By its explicit terms, the policy automatically rejected—at the first step of the application process—all work-authorized non-citizens, except those specifically identified as exempt.  P&G's initial questionnaire asked applicants whether they were a U.S. citizen, or a LPR, asylee, or refugee, or an immigrant admitted for residence under the 1986 immigration law.  If the applicant answered "NO," he or she was automatically rejected. However, if the applicant was a U.S. citizen and answered "YES," the application could proceed for further review.  By asking "[a]re you currently a U.S. citizen OR national" as a criterion for exclusion, the policy explicitly singled out non-citizens and subjected them to less favorable treatment.  *See Nyquist v. Mauclet*, 432 U.S. 1, 9 (1977) (finding policy to be discriminatory on the basis of alienage because it was "directed at aliens and that only aliens [were] harmed by it.").  The policy therefore cannot survive the but-for test; while all U.S. citizens were not affected and could proceed to subsequent phases of the application process, all work-authorized non-citizens were automatically rejected, unless they belonged to an exempt subclass.  *See Comcast Corp.*, 140 S. Ct. at 1014.  The policy is therefore akin to those that courts have found to be facially discriminatory for subjecting some, or all, individuals of a protected class to less favorable treatment.  *See Johnson Controls*, 499 U.S. at 197 (policy that excluded all women from lead-exposed jobs, except those whose inability to bear children was medically documented, "create[d] a facial classification based on gender."); *Phillips v. Martin Marietta Corp.*, 400 U.S. 542 (1971) (policy that excluded all women with pre-school-age children from employment

was facially discriminatory); *Frank v. United Airlines, Inc.*, 216 F.3d 845, 853 (9th Cir. 2000) (airline policy where "men could generally weigh as much as large-framed men," while "women could generally not weigh more than medium-framed women" was facially discriminatory); *Healey v. Southwood Psychiatric Hosp.*, 78 F.3d 128, 130 (3d Cir. 1996) (hospital policy that considered gender in assigning staff to either morning, or less favorable night shifts, was facially discriminatory).

P&G claims that because LPRs, asylees, and refugees were not automatically excluded, and many of these immigrants were employed at the Company, the policy did not discriminate on the basis of alienage. However, the Supreme Court has made clear that a policy can be facially discriminatory against a protected class, even if not all members of that class are subject to adverse treatment. In *Phillips*, the Supreme Court explained that an employer's policy that barred all married women with preschool children from employment was facially discriminatory against women, even though 75 to 80 percent of the employees in the position the plaintiff sought were women. *See Phillips*, 400 U.S. at 543. Similarly, in *Johnson Controls*, a battery manufacturer maintained a fetal-protection policy that excluded all women, except those whose inability to bear children was medically documented, from positions that could lead to lead exposure. Men were not affected by the policy regardless of their fertility. Although the policy did not bar all women, the Court nonetheless found that it excluded "women with childbearing capacity from lead-exposed jobs and so creates a facial classification based on gender." *Johnson Controls*, 499 U.S. at 197; *see also Connecticut v. Teal*, 457 U.S. 440, 455 (1982) ("It is clear that Congress never intended to give an employer license to discriminate against some employees on the basis of race or sex merely because he

27

favorably treats other members of the employees' group."); *Furnco Const. Corp. v. Waters*, 438 U.S. 567, 579 (1978) ("A racially balanced work force cannot immunize an employer from liability for specific acts of discrimination."). Thus, P&G misinterprets the law when it argues that its employment of *some* work-authorized non-citizens absolves it of *all* liability for intentional alienage discrimination.

Defendant next asserts that the policy excluded DACA recipients because of their "immigration status," a classification it contends is distinct from "alienage" and lawful under Section 1981. The Court finds this argument unavailing. The cases cited by P&G do not convince the Court that discrimination based on "immigration status" is either distinct from alienage discrimination or lawful under Section 1981.[17]

To the contrary, courts have found similar policies that subject only certain subclasses of immigrants to adverse treatment to constitute alienage discrimination. In *Nyquist v. Mauclet*, 432 U.S. 1 (1977), the Supreme Court expressly rejected the distinction P&G now attempts to draw. *Nyquist* involved an Equal Protection challenge to a New York statute that barred certain non-citizens from eligibility for state financial

---

[17]  P&G cites to district court cases from other circuits to support its contention that P&G's policy discriminates based on "immigration status," not "alienage." The cited cases are factually distinguishable because they did not involve a facially discriminatory policy that denied employment to subclasses of non-citizens. In *Vaughn v. City of New York*, 2010 WL 2076926 (E.D.N.Y. May 24, 2010) and *Talwar v. Staten Island University Hosp.*, 2014 WL 5784626 (E.D.N.Y. Mar. 31, 2014), the court granted summary judgment in favor of employers on the Section 1981 claim because the record lacked sufficient evidence that employees were subject to adverse employment action because of their lack of U.S. citizenship—not because the court had found that the alleged discrimination was on the basis of "immigration status," as opposed to "alienage." *Camara v. Schwan's Food Manufacturing, Inc.*, 2005 WL 1950142 (E.D. KY. Aug. 15, 2005) is distinguishable because it was decided in the context of a motion to amend the complaint to add a Section 1981 claim. The district court denied the motion in part because the Sixth Circuit had not addressed whether Section 1981 prohibits private alienage discrimination.

assistance programs for higher education.  That policy is very similar to P&G's; under the

statute, to qualify for the scholarship programs, the applicant:

> (a) must be a citizen of the United States, or (b) must have
> made application to become a citizen, or (c) if not qualified for
> citizenship, must submit a statement affirming intent to apply
> for United States citizenship as soon as he has the
> qualification, and must apply as soon as eligible for
> citizenship, or (d) must be an individual of a class of refugees
> paroled by the attorney general of the United States under his
> parole authority pertaining to the admission of aliens to the
> United States.

*Nyquist*, 432 U.S. at 4.

Plaintiffs in that case did not qualify for scholarships because they were not U.S.

citizens and also did not belong to a subclass of eligible immigrants.  The Court held that

the classification drawn by the statute constituted "alienage classification," and that its

constitutionality would therefore be reviewed under strict scrutiny.  *Id.* at 7.  In doing so,

the Court flatly rejected the state's argument—identical to the one P&G now asserts—

that the policy "does not impose a classification based on alienage."  *Id.* at *7-8.  Like

P&G, the state explained that the policy did not ban *all* non-citizens, but only those with

certain immigration statuses, claiming that the statute "distinguishes 'only within the

'heterogenous' class of aliens' and 'does not distinguish between citizens and aliens vel

non.'"  *Id.* at 8.  The Court rejected the state's argument as incompatible with its prior

decision in *Graham v. Richardson*[18], and explained, "[t]he important points are that [the

---

[18] In *Graham v. Richardson*, 403 U.S. 365 (1971),  the Supreme Court struck down an Arizona
statute that only allowed a subclass of immigrants—those who met a 15-year durational residency
requirement—to obtain welfare assistance.  *Nyquist* found that *Graham* undermined the state's
argument that the New York law was not discriminatory on the basis of "alienage" because it did
not discriminate against *all* non-citizens, explaining "the Arizona statute served to discriminate
only within the class of aliens . . . [t]he Court nonetheless subjected the statute to strict scrutiny
and held it unconstitutional."  *Nyquist*, 432 U.S. at 8.

policy] is directed at aliens and that only aliens are harmed by it.  The fact that the statute is not an absolute bar does not mean that it does not discriminate against the class."  *Id.* at 9.  The Supreme Court's reasoning for finding the statute discriminatory on the basis of "alienage" applies with equal force here: by its explicit terms, P&G's policy was directed only at aliens, while no U.S. citizens were adversely affected.[19]

More recently, in *Dandamudi v. Tisch*, 686 F.3d 66, 69 (2d Cir. 2012), the Second Circuit assessed the constitutionality of a New York statutory requirement "that only U.S. Citizens or Legal Permanent Residents ("LPRs") are eligible to obtain a pharmacist's license in New York."  Plaintiffs were "nonimmigrant aliens" with temporary worker visas, many of whom had applied for, but had not yet received, permanent resident status.  Like P&G's policy, the statutory scheme only excluded certain subclasses of non-citizens. Nonetheless, the court found that it classified on the basis of alienage, explaining "[because] there are no compelling reasons for the statute's ***discrimination based on alienage***, we hold the New York's statute to be unconstitutional."  *Dandamudi*, 686 F. 3d at 70 (emphasis added).  In doing so, the court rejected the state's argument—similar to that asserted by P&G—that its exclusion of nonimmigrant aliens should be analyzed differently from alienage discrimination; the state argued that the "strict scrutiny analysis of classifications based on 'alienage' is inapplicable to classifications of nonimmigrant aliens and that only rational basis review of the statute is required."  *Id.* at 74.  The court declined to recognize this distinction, and refused to establish a new exception to the "general rule that classifications based on alienage are suspect and subject to strict

---

[19] While the Eleventh Circuit in *Estrada* distinguished *Nyquist* and *Graham* to conclude that strict scrutiny in an Equal Protection context did not apply, it did not address *Nyquist*'s finding that discrimination against subclasses of non-citizens because of their "immigration status" is not legally distinct from "alienage" discrimination.

scrutiny review." *Id.* at 78. Accordingly, *Dandamudi* further undermines P&G's position that its policy of categorically rejecting all work-authorized non-citizens, except LPRs, asylees, and refugees, does not constitute alienage discrimination.[20]

Finally, P&G argues that its hiring policy was for a legitimate business purpose, claiming that recruiting interns unable to work in the U.S. long-term, or who are subject to immediate deportation, is incompatible with its "develop from within" hiring plan. However, the Supreme Court has made clear that "the absence of a malevolent motive does not convert a facially discriminatory policy into a neutral policy with a discriminatory effect. Whether an employer practice involves disparate treatment through explicit facial discrimination does not depend on why the employer discriminates but rather on the explicit terms of the discrimination." *Johnson Controls*, 499 U.S. at 199. Indeed, the policy in *Johnson Controls* was for an arguably laudatory and non-discriminatory purpose: to protect the health of unborn children. Nonetheless, the Court found that it "explicitly discriminate[d] against women on the basis of their sex." *Id.* at 197. Here, by its explicit terms, P&G's policy is facially discriminatory on the basis of alienage; neither its purpose nor P&G's lack of animus renders it otherwise.[21]

---

[20] During oral argument, P&G argued for the first time—and without citing to the statutory text, legislative history, or case law—that Congress intended IRCA to be the exclusive remedy against "immigration status" discrimination. Under IRCA, permanent residents, refugees, and asylees are specifically identified as protected from "immigration status" discrimination. *See* 8 U.S.C. § 1324b(a)(3)(B). P&G therefore argues that employers may lawfully discriminate against all other non-citizens based on their "immigration status," because they do not belong to the class protected under IRCA. The Court will not consider this argument because it has not been briefed by the Parties. *See McFarlin v. Conseco Servs., LLC*, 381 F.3d 1251, 1263 (11th Cir. 2004) ("A party is not allowed to raise at oral argument a new issue for review."). The Court further notes that while IRCA expressly excludes certain subclasses of immigrants from its protection against citizenship discrimination, *see* 8 U.S.C. § 1324b(a)(3)(B), individuals with deferred action status are not identified as part of this excluded cohort.

[21] P&G also cites to a letter from Deputy Special Counsel of the Office of Special Counsel for Immigration-Related Unfair Employment Practices, in which the Deputy Special Counsel provided

**C.  The Equal Protection Analysis in *Estrada* does not Control the Section 1981 Analysis in this Case**

P&G next argues that because the Eleventh Circuit held in *Estrada* that a state policy that facially discriminated against DACA recipients was in compliance with the *Equal Protection Clause*, any policy that facially discriminates against DACA recipients will not violate *Section 1981*.  The Court is not persuaded that this is the case.

*Estrada* involved a state policy that prohibited DACA recipients from attending Georgia's three most selective universities.  *See Estrada*, 917 F.3d at 1302.  The plaintiffs, DACA recipients who were qualified and wished to attend these universities but were barred from admission, challenged it as unconstitutional.  The Eleventh Circuit found that the policy was not preempted under the Supremacy Clause and that its exclusion of DACA recipients did not violate the Equal Protection Clause.  The court applied rational basis review to assess the policy's constitutionality, after finding that public education is not a fundamental right and that the policy excluded only individuals who could not "be treated as a suspect class."  *Id.* at 1308-1309.  It held that the state's exclusion of DACA recipients was "rationally related to the state's legitimate interest in responsibly investing state resources," explaining:

> The Policy applies only to selective schools that did not admit all qualified applicants in the last two years.  Because the schools cannot admit all qualified applicants, the Georgia System Regents must prioritize which students to admit.  The Regents could have decided to prioritize those students who are more likely to stay in Georgia after graduation. . . . Thus,

---

"general guidelines" on IRCA and suggested that an employer may ask applicants whether they require visa sponsorship and reject those who answer "YES."  (*See* DE 104-4.)  This letter suggests that employers are not required to incur the financial expenses of visa sponsorship.  But it does not address whether P&G may—consistent with IRCA or Section 1981—rely on a question that explicitly asks applicants if they are a U.S. citizen, or a LPR, refugee, or asylee, and reject those who answer "NO."  Accordingly, the Court finds no inconsistency between the Court's finding and the guidance set forth in the letter.

> the Policy is rationally related to the state's legitimate interest
> in responsibly investing state resources.

*Id.* at 1311.

*Estrada* is not determinative of the issues in the instant case.  As an initial matter, the policy in *Estrada* only barred DACA recipients from attending Georgia's three most selective post-secondary schools but did not prohibit them from attending all other public universities or community colleges in the state.  In its Equal Protection analysis, the Eleventh Circuit emphasized this feature of the policy, noting that it did not "strike[ ] at appellants' ability to exist in the community," and that "[a]ppellants may pursue postsecondary education outside these three schools, and the Policy in no way undermines appellants' deferred action status."  *Estrada*, 917 F.3d at 1310.  Here, the record suggests that P&G's policy excludes DACA applicants from all positions at the Company.  And if all employers could adopt similar policies categorically rejecting DACA recipients, their ability to exist in the community and deferred action status would be undermined, because DACA recipients are *required* to work as a condition of their deferred action.  *See Regents*, 908 F.3d at 490 (citation omitted).  As noted by the Supreme Court, "[t]he assertion of an authority to deny to aliens the opportunity of earning a livelihood . . . would be tantamount to the assertion of the right to deny them . . . abode, for in ordinary cases they cannot live where they cannot work."  *Takahashi*, 334 U.S. at 416; *Truax v. Raich*, 239 U.S. 33, 41 (1915) ("It requires no argument to show that the right to work for a living in the common occupations of the community is of the very essence of the personal freedom and opportunity that it was the purpose of the Amendment to secure.").

Moreover, *Estrada* had no occasion to consider whether the policy there constituted unlawful alienage discrimination under Section 1981.  Consequently, the Court finds that *Estrada*'s Equal Protection analysis does not control the Section 1981 analysis in this case, in light of the following well established principles: (1) the scope of protections afforded to immigrants protected under Section 1981 is greater than, and therefore not limited to, the protections they receive under the Equal Protection Clause; (2) the fact that a group is not a "suspect class" under the Equal Protection Clause does not preclude them from receiving greater statutory protection as protected persons of laws enacted under Section 5 of the Fourteenth Amendment, including Section 1981; and (3) there are significant doctrinal differences for establishing liability under the Equal Protection Clause and Section 1981, which follows the Title VII framework, such that a policy could simultaneously be in compliance with the Equal Protection Clause, but in violation of Section 1981.

In an attempt to establish that *Estrada* controls the Section 1981 analysis in this case, P&G cites to *Juarez* and *Takahashi* to support its contention that the alienage protections of Section 1981 are co-extensive with that of the Equal Protection Clause, such that "[c]ourts should look to interpretation of the Equal Protection Clause to determine whether a classification under Section 1918 is facially discriminatory." (DE 106 at 13.)  *Juarez* opined that a policy that violates the Equal Protection Clause will also necessarily violate Section 1981—suggesting that Section 1981's protections against alienage discrimination cannot be any *less* protective than that of the Equal Protection Clause.  *See Juarez*, 69 F. Supp. 3d at 373.  But neither *Juarez* nor *Takahashi* supports the inverse proposition that Section 1981 cannot afford *greater* protection against

alienage discrimination than the Equal Protection Clause.  Accordingly, they lend no support to P&G's position that a policy that complies with the Equal Protection Clause will also necessarily be lawful under Section 1981.

To the contrary, the Supreme Court has made clear that statutes enacted to enforce the Equal Protection Clause pursuant to Section 5 of the Fourteenth Amendment, including Section 1981, may afford greater protection than the Constitution by proscribing even those practices that do not violate the Equal Protection Clause.  *See Katzenbach v. Morgan*, 384 U.S. 641, 648 (1966) (Congress' legislative authority under Section 5 of the Fourteenth Amendment is not limited to proscribing only those policies "that the judicial branch was prepared to adjudge unconstitutional. . . ."); *City of Boerne v. Flores*, 521 U.S. 507, 518 (1997) ("Legislation which deters or remedies constitutional violations can fall within the sweep of Congress' enforcement power even if in the process it prohibits conduct which is not itself unconstitutional . . . ."); *Arritt v. Grisell*, 567 F.2d 1267, 1272 (4th Cir. 1977) ("Legislation authorized by § 5 of the Fourteenth Amendment can prohibit practices which would pass muster under the Equal Protection Clause, absent an act of Congress.").

Indeed, Section 1981's alienage discrimination protections do extend broader than that of the Equal Protection Clause; certain conduct not cognizable under the Equal Protection Clause is actionable under Section 1981.  For instance, Section 1981 prohibits racial and alienage discrimination in the private sector, while the Equal Protection Clause only applies to governmental conduct.  *See* 42 U.S.C. § 1981 (c) ("The rights protected by this section are protected against impairment by nongovernmental discrimination and impairment under color of State law.").  Moreover, while retaliation is not actionable under

the Equal Protection Clause, it constitutes prohibited conduct under Section 1981.  *See Watkins v. Bowden*, 105 F.3d 1344, 1354 (11th Cir. 1997); *CBOCS West, Inc. v. Humphries*, 553 U.S. 442 (2008) (holding that Section 1981 encompasses retaliation claims).  Accordingly, P&G's suggestion that the scope of protections afforded non-citizens under Section 1981 cannot be any broader than that of the Equal Protection Clause is incorrect.

P&G next argues that because *Estrada* declared that DACA recipients do not belong to a "suspect class" under the Equal Protection Clause, DACA recipients are not a "protected class" under Section 1981.  The Court finds this argument to be unavailing because whether a group is protected under a statute enacted under Section 5 of the Fourteenth Amendment solely depends on the intent of Congress, and does not turn on whether courts have declared that group a "suspect class" under the Equal Protection Clause.[22]  Indeed, several statutes enacted pursuant to the Fourteenth Amendment protect groups that are not "suspect" under the Equal Protection Clause, and have afforded them protection beyond those they are entitled to under the Constitution.  For instance, individuals over 40 are a "protected class" under the ADEA, even though "age is not a suspect classification under the Equal Protection Clause."  *See Kimel v. Fla. Bd. of Regents*, 528 U.S. 62, 83 (2000); *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 312 (1996).  While disabled individuals are not a "suspect class" under the Equal Protection Clause, they are entitled to the protections of the ADA.  *See Bowers v. Nat'l Collegiate Athletic Ass'n*, 475 F.3d 524, 553 (3rd Cir. 2007).  Similarly, the fact that

---

[22] *See E.E.O.C. v. Tortilleria La Mejor*, 758 F. Supp. 585, 587 (E.D. Cal. 1991) (finding that "unlawfully present" immigrants are protected under Title VII after engaging in statutory interpretation to discern Congress's intent).

pregnant women do not belong to a "suspect class" under the Constitution does not preclude them from receiving the protections of Title VII. *See Maher v. Roe*, 432 U.S. 464, 470 (1977); *Newport News Shipbuilding & Dry Dock Co. v. E.E.O.C.*, 462 U.S. 669, 684 (1983) ("The Pregnancy Discrimination Act has now made clear that, for all Title VII purposes, discrimination based on a woman's pregnancy is, on its face, discrimination because of her sex."). As previously discussed, the Court's finding that DACA recipients are protected under Section 1981 is supported by the statute's text and legislative history. Their exclusion from a "suspect class" under the Equal Protection Clause has no bearing on the Court's statutory analysis.

Finally, there are significant differences in the legal framework used for assessing liability under the Equal Protection Clause and Section 1981, such that the outcome of an Equal Protection challenge does not control the outcome of a Section 1981 case. The test applied to determine the legality of a facially discriminatory policy under the Equal Protection Clause depends on the status of the excluded group (suspect or non-suspect class) and the right compromised (fundamental or non-fundamental right). *See Plyler v. Doe*, 457 U.S. 202, 216 (1982). Because *Estrada* declared that DACA recipients are not a suspect class, and neither public education nor employment is a fundamental right, a policy that facially discriminates against DACA recipients in these contexts violates the Equal Protection Clause only if it cannot survive rational basis review. *See Heller v. Doe by Doe*, 509 U.S. 312, 319 (1993) ("a classification neither involving fundamental rights nor proceeding along suspect lines is accorded a strong presumption of validity."). "Traditional rational basis review is highly deferential to government action." *Jones v. Governor of Fla.*, 2020 WL 829347, at 9 (11th Cir. Feb. 19, 2020). In assessing a policy

under rational basis review, courts look to "whether there is any rational basis for the law, even if the government's proffered explanation is irrational, and even if it fails to offer any explanation at all." *Id.*

By contrast, for claims of private intentional discrimination, the framework for establishing liability under Section 1981 "is the same as the formulation used in Title VII discriminatory treatment cases." *Ferill v. Parker Grp.*, *Inc.*, 168 F.3d 468, 472 (11th Cir. 1999). Under Title VII, a policy that is facially discriminatory against members of a protected class violates the statute, unless the employer can establish a bona fide occupational qualification ("BFOQ"). [23] *See Johnson Controls, Inc.*, 499 U.S. at 206. The BFOQ is an extremely narrow exception to the general prohibition against policies that facially discriminate based on a protected characteristic. *See id.* at 201 ("The BFOQ defense is written narrowly, and this Court has read it narrowly"). "To prove a BFOQ, the employer must show that [the protected characteristic] is a qualification 'reasonably necessary to the normal operation of that particular business or enterprise.'" *Garrett v. Okaloosa Cnty.*, 734 F.2d 621, 624 (11th Cir. 1984) (citation omitted). "The BFOQ defense has been construed very narrowly to apply 'only when the *essence* of the business operation would be undermined by not hiring members of the protected class' exclusively." *Id.* (citation omitted).

As a result of the doctrinal differences in Section 1981 and the Equal Protection Clause, a policy that facially discriminates against DACA recipients violates Section 1981

---

[23] The BFOQ defense does not shield employers from liability for employer racial discrimination, but courts have not considered whether BFOQ is a defense to alienage discrimination. *See Ferrill*, 168 F.3d at 473 ("the BFOQ defense does not apply to racial discrimination. . . ."). The Court assumes, without deciding, that it is.

unless the employer can establish a BFOQ, but violates the Equal Protection Clause only if there is no possible rational basis for it.[24]   Because assessing whether a policy constitutes a BFOQ is a "much more rigorous test" than determining whether it is justified by a rational basis, *Estrada*'s Equal Protection analysis does not control the Court's Section 1981 analysis.   *Kimel v. State Bd. of Regents*, 139 F.3d 1426, 1448 (11th Cir. 1998) (Cox, Concurring).   For these reasons, P&G's motion is denied as to its argument that *Estrada* requires the Court to hold that P&G's exclusion of DACA recipients "is not an improper classification under Section 1981."[25] (DE 106 at 15.)

### D. P&G Cannot Rely on the "Same-Decision" Defense

Finally, P&G is not entitled to summary judgment on its "same-decision" defense, which is unavailable to an employer when a policy is facially discriminatory. *See McCormick v. Archstone-Smith Communities, LLC*, 2008 WL 11402014, at *2 (S.D. Fla. Jan. 15, 2008) ("Plaintiff is correct that the only defense to a facially discriminatory policy is a BFOQ."); *Johnson Controls*, 499 U.S. at 200 (a facially discriminatory policy is

---

[24] Cases evaluating the legality of mandatory retirement and maximum hiring age policies under the Equal Protection Clause and the ADEA—which also follows Title VII's intentional discrimination framework—are instructive, demonstrating that a policy can survive rational basis review under the Equal Protection Clause, but nonetheless violate the ADEA for lack of a BFOQ. *See*, *e.g.*, *Hahn v. City of Buffalo*, 770 F.2d 12, 13 (2d Cir. 1985) (affirming finding that policy setting the maximum hiring age as 29 for police officers was lawful under the Equal Protection Clause, but unlawful under the ADEA); *Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307 (1976) (compulsory retirement at age 50 for police officers did not violate Equal Protection Clause); *U.S. Equal Employment Opportunity Comm'n v. City of St. Paul*, 671 F.2d 1162 (8th Cir. 1982) (affirming finding that mandatory retirement age of 65 was not support by a BFOQ for all positions in the fire department, except for district fire chief); *E.E.O.C. v. Los Angeles Cnty.*, 706 F.2d 1039, 1040 (9th Cir. 1983) (affirming finding that maximum hiring age of 35 violated the ADEA).

[25] The Court further notes that not all policies that are facially discriminatory with regard to DACA recipients can survive rational basis review.  *See, e.g.*, *Arizona Dream Act Coal. v. Brewer*, 757 F.3d 1053 (9th Cir. 2014) (finding that Arizona's policy of denying driver's licenses to DACA recipients was not rationally related to any legitimate state purpose).

"forbidden under Title VII unless respondent can establish that sex is a 'bona fide occupational qualification.'"); *Comcast*, 140 S. Ct. at 1017-1018 (holding that "same decision" is not an available defense for a Section 1981 claim).  Because P&G cannot rely on the "same decision" defense in this case, P&G's motion is also denied as to this argument.

IV.    **CONCLUSION**

For these reasons, Defendant's motion for summary judgment (DE 106) is **DENIED**.


**DONE AND ORDERED** in chambers in Miami, Florida, this <u>10th</u> day of June, 2020.


KATHLEEN M. WILLIAMS
UNITED STATES DISTRICT JUDGE